Monticello Cotton Mills, Inc., *v.* Powell.

4-8910                                    221 S. W. 2d 33

Opinion delivered June 13, 1949.

Rehearing denied July 4, 1949.

*Williamson & Williamson,* for appellant.

*Jim Merritt* and *Louis Watts,* for appellee.

Ed. F. McFaddin, Justice. John Powell sued Monticello Cotton Mills (hereinafter called Monticello) for damages and also for specific performance of a contract of employment. From the decree allowing damages, Monticello has appealed; and from the decree refusing specific performance, Powell has appealed.

## FACTS

Monticello (defendant below and appellant here) is a corporation, and, in the operation of its cotton mill, it

employs a large number of people. John Powell (plaintiff below and appellee here) was an employee of Monticello, being a doffer, as that term is known in cotton mill parlance. In order to provide a lunch and cold drink concession for the convenience of its employees, Monticello constructed a lunch counter in the mill; and the operator thereof also had a wheel cart to be used in carrying the lunch stand commodities through the mill for sale to the employees.

On November 6, 1946, Monticello and Powell entered into a written contract, the portions of which material to this case are as follows:

"1. John Powell agrees to rent from Monticello Cotton Mills, Inc. a certain portion of the main building to be used for a means of supplying the employees of the Monticello Cotton Mills food, drinks, candy and other things to eat.

"2. This agreement shall run for one year from date of signing.

"3. The rent shall be $25 per month payable at the end of each month.

"4. The Monticello Cotton Mills, Inc., agrees to allow John Powell to use the equipment now located in its plant as listed without any charge.

"9. There shall be no sub-leasing by John Powell unless permission is obtained in writing from the Monticello Cotton Mills, Inc.

"10. John Powell shall be subject to any rules and regulations the Monticello Cotton Mills, Inc. shall prescribe for the satisfactory dealings between employees and John Powell.

"11. In case John Powell does not carry out any of the terms of this agreement, he agrees to allow the Monticello Cotton Mills to cancel this agreement by giving him 30 days notice in writing without any recourse on them.

"12. In case John Powell wishes to terminate this agreement for any cause, he shall give the Monticello

Cotton Mills, Inc. 30 days notice in writing of his intention.

"13. It is agreed that John Powell will be given a job as a doffer in the event he terminates this agreement. In case the Monticello Cotton Mills decides he has been guilty of misconduct during the term of this agreement which necessitates the termination of the agreement by the company, then it will be optional with them to give him work."

We will hereinafter refer to the lunch and cold drink stand and the wheel cart, etc., as "the concession." On Monday morning, December 2, 1946, Powell was unable to operate the concession because of his intoxication. He was an alcoholic, and at regular intervals would go on a drinking spree of several weeks' duration. As to his condition the first week in December, 1946, Powell testified that he had been drinking over the weekend; that when he reported at the concession Monday morning Mr. Taylor, the general superintendent of Monticello, told him: "It was reported that you were drunk last night, and are drinking this morning. Let your wife or some of the help run the joint."

Powell's testimony continues:

"I was used to taking orders, and I said, 'If you think it is best, I will.' So, I told my cook to take over and take care of the receipts. My wife comes in at eleven or twelve. Well, then I kinder got tight that evening.

. . . . . . . . .

Q. That was Monday? A. Yes, sir. Q. Did you go back to work on Tuesday? A. I was back there Tuesday morning. Q. Did you start to work? A. I loaded my box, moved it to the same position and Mr. Taylor came in three minutes to eight and said, 'Come into my office.' I followed him in and he said, 'You were drinking again last night and this morning.' I said, 'I was last night, but I was off the job.' He said, 'You better lay off again today.' I said, 'I am not drunk.' And he said, 'I think it best.' So, I pushed the box back toward the door and told my cook they laid me off and asked,

'Where are the receipts from yesterday? She said, I
don't know.' Q. Did you go back to work Wednesday?
A. Yes, sir. Q. What time? A. Six-thirty or fifteen to
seven. Q. What preparation did you make for that day?
A. Same thing, loaded my box and moved to the same
spot. Q. What happened? A. I met Mr. Taylor, and
he said, 'You are drinking and you will have to lay off.'
I protested a little. I said, 'Somebody is breaking me.
I have no receipts from yesterday.' He said, 'Lay off
until dinner, I can smell it on you', and I said, 'You can
drink at night and the next morning you can smell it.'
I was about half mad then and did drink some more.''

By other witnesses it was shown that Mrs. Powell
locked him in his room at the hotel one night because
of his intoxicated condition; that he spent Tuesday
night, December 3rd in jail, and that he was fined in the
mayor's court Wednesday morning for drunkenness;
and that he remained intoxicated for some time there-
after. Appellant has a long standing rule against intoxi-
cation of employees, which rule appears to have been
regularly enforced; any employee coming into the mill
in an intoxicated condition is summarily discharged and
is not entitled to be re-employed. In keeping with this
rule, on Wednesday or Thursday (December 4th or 5th),
Mr. Taylor, the superintendent of Monticello told Pow-
ell that he would not longer be allowed to come to the
mill.

So, on Friday, December 6th, Powell and his wife,
at the suggestion of Mr. Thomas, the general manager of
Monticello, sold the concession to Will Lane for $194.
Powell and his wife were involved in domestic diffi-
culties due to Powell's alcoholism, and each was repre-
sented by an attorney. Powell and his wife and their
attorneys met at the office of Mrs. Powell's attorney on
December 6th, and divided the proceeds received from
the sale of the concession. Mrs. Powell filed suit for
divorce on the grounds of indignities and habitual drunk-
enness; and obtained a divorce on January 20, 1947.

The exact whereabouts and conduct of Powell from
December 6, 1946, to January 20, 1947, are not clearly

shown; but on the last-mentioned date Powell made formal application to Monticello for employment. This application was by a letter of that date, reading in part:

"On or about November, 1946, I made and entered into an agreement in writing with the Monticello Cotton Mills, Inc. by O. S. Thomas, wherein it was agreed that I was to rent from the Monticello Cotton Mills, Inc. a certain portion of the main building to be used for a means of supplying the employees of the Monticello Cotton Mills food, drinks, candy and other things to eat. Under this agreement I began on or about November 6, 1946, to conduct the business above mentioned under the name of 'Monticello Cotton Mills Sandwich Shop.' On or about December 6, 1946, I was forced to discontinue said operations. This agreement above referred to was terminated. Under section 13 of this contract above mentioned it states, 'It is agreed that John Powell will be given a job as a doffer in event he terminates this agreement.' There follow certain statements that are immaterial to this phase of the matter.

"Please consider this written request as evidence of my desire to carry out the terms of the section of the contract heretofore referred to. You will recall that on December 16, 1946, and December 18, 1946, I made request to be returned to work. In view of the provision above referred to, I am also making formal demand for wages that would have been received by me during this period had the contract been carried out. I am now ready and willing to carry out the terms of the contract by reporting to work as a doffer at the Monticello Cotton Mills, when you call me. You may call me at 308, Monticello, Arkansas, by telephone, or by letter to East College Avenue, Monticello, Arkansas.

"If nothing is heard from you within seven days it will be considered that you do not care to comply with the terms of the agreement above referred to and proper action will be taken to require a specific performance thereof. . . . . . . ."

When Monticello refused to re-employ Powell, he filed this suit on April 30, 1947, praying:

"Wherefore premises considered plaintiff prays that the Court make and enter an order requiring the defendant to carry out the terms and provisions of section thirteen of the contract herein and return this plaintiff to work as a doffer in said cotton mill and to pay him the sum of $516.80 for loss of wages. . . . . ."

A trial resulted in the decree awarding Powell damages in the sum of $489.60 for net loss of employment from December 28, 1946, to July 26, 1947, but denying Powell's prayer for specific performance of the contract of employment. Monticello has appealed from the money judgment against it, and Powell has appealed from the decree refusing him specific performance of the contract of employment.

## OPINION

Able briefs have been filed, arguing many questions, but we find it necessary to consider only Powell's claim for damages. Powell insists that he—and not Monticello—terminated the concession contract; that both sides waived the 30-day notice of termination as contained in sections 11 and 12; and that when he terminated the concession contract he was entitled to be re-employed as a doffer under section 13 of the contract. Monticello contends, *inter alia*: that, regardless of who terminated the contract, the intoxication of Powell was cause for discharge; that Monticello, under section 13 of the contract, decided that Powell was guilty of misconduct, and that, since he was not entitled to re-employment, he was not entitled to recover damages.

Assuming—but not deciding—that section 13 of the contract was sufficiently definite to constitute an enforceable contract of employment;[1] and again assuming—but not deciding—that the damages could be assessed without such judgment being contrary to our being in the mill intoxicated or under the influence of

---

[1] For cases holding contracts of employment to be indefinite, and therefore unenforceable, see St. L. I. M. & S. Ry. v. Matthews, 64 Ark. 398, 42 S. W. 902, 39 L. R. A. 467; Fulkerson v. Western Union Tel. Co., 110 Ark. 144, 161 S. W. 168, Am. Cas. 1915 D, 221; Ashley Ry Co. v. Baggott, et al., 125 Ark. 1, 187 S. W. 649.

holdings in similar cases,[2] neverthless, we agree with Monticello that under the facts in this case Powell's intoxication defeats his recovery. This conclusion renders moot all of Powell's claim for specific performance of the alleged contract of employment.

J. H. Scogin testified that in 1946 he was president of the Local Labor Union, with which Monticello bargained collectively, and that the Union approved the rule of Monticello concerning intoxication. This is his testimony:

"Q. Do you know what the rules of the Monticello Cotton Mills, Inc. are in regard to people being in the mill in an intoxicated condition? A. Yes, sir. Q. What are they? A. Give them their time. Q. What do you mean? A. Fire them, lay them off, get them out of the mill. Q. Does that apply to people not employed in the mill, as well as employees, to get them out of the mill? A. Yes, sir, that is a dangerous thing. Q. But if a man is an employee of the mill and intoxicated in the mill, what is the rule? A. They discharge him. Take him out of the mill. . . . . ."

F. W. Stone testified that he was a mechanic at Monticello's mill:

"Q. Mr. Stone, are you familiar with the rules of the Monticello Cotton Mills, Inc. in regard to persons being in the mills intoxicated or under the influence of liquor? A. Yes, sir. Q. What are those rules? A. Discharge. Q. Will you amplify that? I know what you mean, and I guess the Court will know. What do you mean by that? A. They are fired. They don't work there any more. Q. If they come into the mill that way? A. Yes. Q. Is that rule well understood among the employees, or not? A. Yes, sir."

The necessity for this rule is shown in the testimony of T. P. Taylor, the superintendent of the mill and next

[2] For a case in which we refused to assess damages in a contract for personal service, see Petty v. Mo. & Ark. Ry. Co., 205 Ark. 990, 167 S. W. 2d 895, in which certiorari was denied by the U. S. Supreme Court, 320 U. S. 738, 64 S. Ct. 37, 88 Law Ed. 437. Also, on the same point, see 12 Am. Juris. 860 and annotation in 35 A. L. R. 1432.

in authority to A. S. Thomas, vice-president and resident manager. Here is Taylor's testimony:

"Q. What effect, if any, does it have on the safety of persons in the mill when a person is in the mill in an intoxicated condition? A. It is dangerous. He is liable to fall in a machine and get badly hurt or liable to get in an argument with any of the employees, and we do not have them in the mill when we know it. Q. Is there, or is there not a great deal of rapidly moving machinery in a cotton mill of this kind, particularly the Monticello Cotton Mills? A. Yes, sir, lots of it. Q. Are the passag - ways between these rapidly moving machines broad or rather narrow? A. Well, they are broad enough for a sober man to walk in, but not for a man under the influence of liquor. Q. What, then, is the rule of the Monticello Cotton Mills, Inc. in regard to persons being in the mill in an intoxicated condition? A. The rule for that is that any man drinking in the mill or under the inflence of whiskey in the mill is to be discharged. .

. . . . . . . . . .

Q. Please state whether or not that rule is well known to the employees of your mill and persons associated with the mill from day to day? A. Yes."

Powell recognized that this rule against intoxication was binding on him as the operator of the concession, because, on each of the mornings as heretofore mentioned (i. e., Monday, Tuesday and Wednesday) when he reported at the concession showing the effects of intoxication, he obeyed the order to leave the premises. Furthermore, he sold the concession after Taylor informed him that he could not operate it any longer. It is clear that Powell's intoxication caused the termination of the contract, even though Powell never paid the $25 monthly rental for November.

Powell insists that Monticello did not terminate the contract, and that he must be re-employed under that part of section 13 of the contract which reads: "It is agreed that John Powell will be given a job as a doffer in the event he terminates this agreement."

But, in urging that sentence, Powell overlooks the remainder of section 13, which reads: "In case the Monticello Cotton Mill decides he has been guilty of misconduct during the term of this agreement which necessitates the termination of the agreement by the company, then it will be optional with them to give him work."

The preponderance of the evidence shows that Monticello, on Wednesday, December 4th, did decide that Powell had been guilty of misconduct, and did so notify him. Monticello's act, in informing Powell, that due to his intoxication he would no longer be tolerated on the premises, was certainly tantamount to a termination of the agreement by Monticello. After such notice, Powell sold the concession to Lane, with the consent of Monticello; and in making that sale both Powell and Monticello waived the 30-day notice of termination, as contained in sections 11 and 12 of the contract. But the factor that caused the sale of the concession by Powell was Monticello's notice to him that he would not be tolerated on the premises, which was certainly a "termination" of his right to operate the concession.

Powell made no request for re-employment when he sold the concession on December 6th. In fact, he fixes his first request for re-employment as being on December 16, when he claims he had a conversation with Thomas. But Thomas says that on the occasion when he met him in a cafe, Powell was then partially intoxicated and so admitted to Thomas. Thus, Powell's intoxication continuing after December 6th would have been cause in itself to discharge him had he been re-employed, and was cause to refuse to re-employ him. There is nothing in the record indicating that Monticello has been arbitrary in exercising its right under section 13 of the contract to refuse to re-employ Powell. On the contrary, we are convinced that Powell's alcoholic affliction caused him to be guilty of such misconduct that Monticello has reasonably exercised its option as contained in section 13.

## CONCLUSION

The judgment in favor of Powell for damages is reversed, and the entire cause of action is dismissed.