596 F.2d 476
 Donald VENTETUOLO, Plaintiff-Appellant,
v.
Dr. Fred BURKE, Commissioner of Education, State of Rhode
Island and Dr. Rudolfo Martinez, Individually and as
Director of Northeast Area Manpower Institute for
Development of Staff, Defendants-Appellees.
 No. 78-1305.
 United States Court of Appeals,
First Circuit.
 Argued Dec. 5, 1978.
Decided March 30, 1979.
As Amended April 25, 1979.
 
 Ralph J. Gonnella, Providence, R. I., for plaintiff-appellant.
 J. Peter Doherty, Sp. Asst. Atty. Gen., Providence, R. I., with whom Julius C. Michaelson, Atty. Gen., Providence, R. I., was on brief, for defendants-appellees.
 Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.
 BOWNES, Circuit Judge.
 
 
 1
 This 1983 civil rights case represents a valiant but vain attempt to establish a constitutionally protected liberty and/or property interest for a state employee who suffered a temporary suspension with pay. The case also involves a pendent state defamation claim.
 
 
 2
 Donald Ventetuolo and Alfred Santaniello, employees of the Northeast Area Manpower Institute for the Development of Staff (NEAMIDS),[1] brought suit against the Commissioner of Education for the State of Rhode Island, Dr. Fred Burke, and the former Director of NEAMIDS, Dr. Rudolfo Martinez. Plaintiffs claimed that Burke and Martinez deprived them of their liberty interest in their reputations and a property interest in continued employment with NEAMIDS without procedural or substantive due process. They also allege defamation under Rhode Island law. In a thoughtful and comprehensive but unfortunately unpublished opinion, the district court found for the defendants on all claims. Only Ventetuolo has appealed.
 
 
 3
 Martinez, whose whereabouts were unknown, was not present at the trial. Since appellant and Santaniello were the only ones who testified, there can be no dispute about the facts which require a detailed exposition. Appellant, prior to 1971, was employed as the State Director of Manpower Development Training Program by the Rhode Island Department of Education (RIDE). He, along with others participated in drafting the initial 1971 NEAMIDS proposal. It provided that, although the NEAMIDS' director had the responsibility of selecting, supervising, and terminating personnel, he was to be responsible to the University of Rhode Island's (URI) vice-president, and the employment of personnel was to be in accordance with all URI state and federal laws, regulations and policies. The program was administered by URI at Kingston in 1971.
 
 
 4
 NEAMIDS' first director was Dr. Rudolfo Martinez. He recruited appellant to work for NEAMIDS in 1971 and offered him the assistant directorship. At the time, appellant was employed by the State of Rhode Island under a union contract which provided that he could be fired only for just cause, and he expressed concern to Martinez about the apparent lack of job security he would have were he to accept the assistant directorship. Appellant testified that Martinez "told me I had nothing to worry about; that as long as he was Director that he had authority and responsibility for this program, and I would have no problem with security." He further testified that Martinez said he could continue in his job "as long as funds were available."[2]
 
 
 5
 Appellant accepted the proffered position and signed a contract with URI, which expired on December 31, 1973.[3] He was not offered nor did he enter into any other written contract with URI. The administration of NEAMIDS was transferred to the Rhode Island Department of Education in January, 1972, where it remained through 1973. Appellant entered into no written contract with RIDE, but received an "appointment sheet" to his position.
 
 
 6
 Operations at NEAMIDS apparently flowed smoothly until the fall of 1971 when it was beset by internal factionalism apparently fomented by a power struggle between native Rhode Islanders and those from outside the state. Appellant represented the natives, while Martinez led the outlanders. Many of the staff's complaints, which centered primarily on their overburdened schedules, were brought to appellant rather than Martinez. Appellant and Martinez discussed these internal difficulties with various officials on the national and regional levels of the Area Manpower Institute for the Development of Staff (AMIDS) program outside of the Rhode Island base. Appellant wrote to Burke in July of 1972 to request a meeting to definitely establish his role, responsibilities, and authority, but no meeting was held.
 
 
 7
 The boiling point was reached at a national AMIDS conference in Kansas in late August, 1972, attended by appellant, Santaniello, Martinez, and other NEAMIDS employees. At a staff meeting held on the evening of August 21, the personnel freely and frankly aired their grievances to Martinez who became so upset that he left the meeting. The next morning, August 22, Martinez hand delivered letters of termination to appellant and Santaniello as they were standing in a breakfast line at the conference. Martinez orally told appellant: "You're terminated. You have to leave immediately." The letter of termination, set out fully in the margin,[4] listed as reasons for the dismissal appellant's "blatant insubordination," "open hostility and complete refusal to accept the commands of the director" and because appellant "observably defied the directives of the national concept." The letter indicated that copies of it were also sent to two administrators of the United States Office of Education in charge of the AMIDS program.[5]
 
 
 8
 Before appellant left the conference, he tried unsuccessfully to contact Burke, and he wrote Burke on August 28 requesting a hearing, but received no response.
 
 
 9
 By letter dated September 6, Martinez rescinded the termination and, instead, suspended appellant with pay for an indefinite period.[6]
 
 
 10
 Appellant filed suit against Martinez and Burke in the district court on November 10. He sought preliminary and permanent injunctive relief from his suspension or termination without a procedural due process hearing. The complaint was amended on November 20, and a motion for a preliminary injunction filed on November 27.
 
 
 11
 In a letter to Burke on November 27, Martinez enumerated the grounds upon which he felt that appellant's employment should be terminated. That letter indicated that copies were sent to the individuals listed in Martinez's August 22 letters of termination and, in addition, to two other national officers of AMIDS.[7] A copy of the letter was placed in appellant's personnel file. Burke forwarded Martinez's letter to appellant by letter dated November 29, and also offered appellant an opportunity to be heard on the charges, although stating that he did not believe appellant was entitled to a hearing because he was a nonclassified employee.
 
 
 12
 Appellant requested a hearing, and a trial type hearing was held before an associate commissioner of RIDE, at which appellant was represented by counsel. The associate commissioner concluded, by decision dated February 7, 1973, that only one of the charges was substantiated; that appellant had, in a heated exchange in Martinez's office, called Martinez a "mouse," for which there was an immediate apology. The associate commissioner found there was no just cause for the termination.[8]
 
 
 13
 Appellant was reinstated by Commissioner Burke on February 8. Martinez was terminated as of the same date.
 
 
 14
 NEAMIDS severed its association with the State of Rhode Island in March of 1973 and relocated at Temple University in Philadelphia, Pennsylvania. Appellant applied for the position of assistant director, but was turned down. Most of the other Rhode Island NEAMIDS' employees were rehired in Pennsylvania.
 
 
 15
 Appellant obtained employment with the State of Rhode Island as the Director of Education with the Rhode Island Department of Corrections about six months later. During the interim, he worked part-time as a consultant to various educational institutions in Rhode Island.
 
 PROPERTY INTEREST
 
 16
 We first address appellant's claim of property interest in his employment. To have a property interest that is constitutionally protected by due process, appellant must have had a legitimate claim of entitlement to continued employment arising out of Rhode Island law. A unilateral expectation is not sufficient. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Willens v. University of Massachusetts, 570 F.2d 403 (1st Cir. 1978); Mack v. Cape Elizabeth School Board, 553 F.2d 720 (1st Cir. 1971). A property interest in the context of appellant's claim was defined as follows:
 
 
 17
 We have made clear in Roth, Supra, at 571-572, 92 S.Ct. 2701, 2709, that "property" interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, "property" denotes a broad range of interests that are secured by "existing rules or understandings." Id. at 577, 92 S.Ct. 2701, 2709. A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing. Ibid.
 
 
 18
 Perry v. Sinderman, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972).
 
 
 19
 A claim of entitlement may be established not only on express statutory grounds and by express contractual provisions, but also by agreements implied from the promisor's words and conduct in light of the surrounding circumstances. Id. at 602, 92 S.Ct. 2694. A property interest has been found where, by statute, rules, or contract the employee can be fired only for cause. Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). A constitutionally protected property interest has not been recognized where the employee serves at the will and pleasure of the public employer. Bishop v. Wood, 426 U.S. 341, 343-47, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), or has no tenure; Willens v. University of Mass., Supra, 570 F.2d 403; Mack v. Cape Elizabeth School Board, Supra, 553 F.2d 720; Patterson v. Ramsey, 552 F.2d 117 (4th Cir. 1977).
 
 
 20
 By Rhode Island statute, professional and administrative personnel in RIDE serve "at the pleasure of the commissioner of education" as unclassified employees. R.I.Gen.Laws § 16-49-7 (1976 Supp.)[9] Appellant does not dispute that he served as a nonclassified employee within the terms of this statute and was not employed pursuant to a written contract at the time of his dismissal. Oral promises to render personal services for an indefinite term are terminable at any time at the will of either party under settled Rhode Island law. School Committee of Providence v. Board of Regents for Education, 112 R.I. 288, 308 A.2d 788 (1973).[10] But,
 
 
 21
 the presumption that a hiring unaccompanied by an expression of time is at will can be rebutted by evidence that the parties intended that it would be a fixed period. Such an intention can be gleaned from the course of prior dealings between the parties or from any other surrounding facts or circumstances which might shed any light on the question.
 
 
 22
 308 A.2d at 790.
 
 
 23
 Appellant bases his property interest claim on the pre-employment promises made by Martinez that, as long as he continued as director of the program, appellant would have "no problem with security" and the job would continue "as long as funds were available." This promise, argues appellant, overcame the statutory presumption of employment at the will of the commissioner and gave him a property interest in continued employment at NEAMIDS sufficient to invoke the mantle of due process.
 
 
 24
 This contention was squarely repudiated by the district court in a series of precise and definite findings, which are binding on us unless clearly erroneous. Fed.R.Civ.P. 52(a). The district court concluded that "Dr. Martinez lacked both actual and apparent authority to promise employment for an indefinite period of time, conditioned only on the availability of federal funds."
 
 
 25
 The court first noted that the commissioner's statutory authority to terminate at will would be abrogated were it to accept appellant's contention that Martinez's pre-employment promises established an entitlement. Indeed, as the court observed, R.I.Gen.Laws § 16-49-7 permits the commissioner to initially contract for up to two years with nonclassified professional employees. Appellant's contract was for less than a year and, when that contract expired of its own terms, no efforts were made by either party to renew it.
 
 
 26
 Since appellant himself participated in the preparation of the 1971 grant proposal outlining the organization of NEAMIDS, the district court found that he knew or should have known that the director did not have the authority appellant sought to impute to him. While the 1971 grant proposal specifies that the director "shall have the responsibility of . . . selecting, supervising and terminating of personnel," it also just as clearly specifies that, consistent with the initial affiliation with URI, the director is ultimately responsible to an official of URI, and that "(e)mployment of personnel . . . will be conducted in accordance with all University, State and Federal laws, requirements and policies." It was a URI official, not Martinez, who signed appellant's initial contract, and, at all times, appellant's pay checks came from the State Department of Education. The district court concluded that these factors clearly established that, although within the immediate office of NEAMIDS the director was supreme, appellant knew or should have known that his authority was at all times subject to state law and state officials.[11]
 
 
 27
 The district court further found that appellant's own actions indicated that he never labored under the misapprehension that Burke's authority as Commissioner of Education had been supplanted by Martinez. Indeed, appellant contacted Burke before the termination dispute arose to clarify his authority and immediately after his termination to request a hearing and after the suspension notice to again request a hearing.
 
 
 28
 The court below also found that, based on his previous employment with the state, appellant was familiar with the state's employment practices, including the absence of contracts, the significance of a nonclassified status, the commissioner's authority over department directors and his power to terminate at will. It concluded that, although NEAMIDS was a hybrid state-federal project, appellant was fully aware that the Rhode Island state employment structure was superimposed on it.
 
 
 29
 Finally, the district court found that Martinez's statements themselves contained no representation that the state authority would terminate appellant only for good cause. Viewing Martinez's statements in the light most favorable to appellant, the court found that Martinez committed only himself, and not the state, to retain appellant absent good cause for termination and provided that federal funds remained available. At most, Martinez was pledging his own intention not to recommend appellant's termination without good cause. Based on all the circumstances, including appellant's familiarity with state employment practices and his actual conduct, the district court concluded that appellant understood the director's assurance as nothing more than his own pledge and that, therefore, the Commissioner of Education was not bound by anything Martinez said prior to appellant becoming an employee. See, e. g., Galaway v. Lawson, 438 F.Supp. 968, 974-75 (D.Minn.1976), Aff'd p. c., 565 F.2d 542 (8th Cir. 1977).
 
 
 30
 These findings, which were securely anchored to current case law, are clearly correct. In Mack v. Cape Elizabeth School Board, supra, 553 F.2d at 722, we noted "the propensity of many persons to over-construe statements in their favor." To that, we add the observation that a hindsight review of statements carries a slanted focus.
 
 
 31
 The district court spent considerable time discussing and rejecting appellant's claim of estoppel in his case against Martinez individually.[12] This, however, has not been pressed on appeal, due undoubtedly to the disappearance of Martinez.
 
 LIBERTY INTEREST
 
 32
 There are two ways in which appellant's constitutional liberty interest could be implicated. First, if Martinez made "any charge against him that might seriously damage his standing and association in (the) community." Board of Regents of State Colleges v. Roth, supra, 408 U.S. at 573, 92 S.Ct. at 2707; Bishop v. Wood, 426 U.S. 341, 348-49, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Second, whether Martinez "imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." Roth at 573, 92 S.Ct. at 2707. But "mere proof, for example, that his record of nonretention in one job, taken alone, might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty'." Roth at 574 n.13, 92 S.Ct. at 2708 n.13.
 
 
 33
 The holding of the Supreme Court in Codd v. Velger, 429 U.S. 624, 628, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977), is apposite here.
 
 
 34
 Since the District Court found that respondent had no Fourteenth Amendment property interest in continued employment, the adequacy or even the existence of reasons for failing to rehire him presents no federal constitutional question. Only if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination is such a hearing required. Roth, supra ; Bishop, supra.
 
 
 35
 While Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), casts some shadow on the continued vitality of a 1983 action based on a defamation liberty interest, its holding was limited to defamation alone without any employment termination. "Thus it was not thought sufficient to establish a claim under § 1983 and the Fourteenth Amendment that there simply be defamation by a state official; the defamation had to occur in the course of the termination of employment." Id. at 710, 96 S.Ct. at 1165.
 
 
 36
 The question here is whether the August letter of termination, the November letter containing Martinez's charges, and their limited publication, plus the termination and then subsequent suspension with pay was sufficient to trigger the due process requirements under Roth and Bishop.
 
 
 37
 The district court found that appellant was not foreclosed from job opportunities, either actual or apparent, and, therefore, his employment opportunity liberty interest was not infringed. This finding is clearly supportable on the record. Appellant was hired by the State of Rhode Island in a supervisory capacity about six months after NEAMIDS moved to Pennsylvania. During the interim period, he worked as an advisor for various educational institutions in Rhode Island. After appellant's ultimate vindication, the records of the charges were expunged from his personnel file and would, therefore, be unavailable to prospective employers. While observing that during appellant's period of suspension, his "few employment applications were rejected," the district court found that "the August charges of insubordination and hostility towards the Director were not tantamount to a 'stigma' that 'foreclosed' job opportunities." We agree.
 
 
 38
 Appellant claims, however, that the district court did not address his contention that the placing of Martinez's letter of November 27 containing eighteen charges against him in his file was sufficient standing alone under Codd v. Velger, supra, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92, to satisfy the public disclosure requirement necessary to give rise to a liberty interest. While the district court may not have mentioned Codd specifically, it did find, "The November charges, which included alleged violations of office policy and incompetence involved incidents so minor that plaintiffs' reputations were secure at all times and vis-a-vis all readers." We concur in this characterization. In Codd, the file information was that the plaintiff had put a gun to his head in an apparent attempt to commit suicide, not, as here, a series of subjective trivial complaints about job performance. See footnote 7, Supra. Moreover, in Codd, the information was actually disclosed to a prospective employer. There is no such claim here, but, even if there had been such disclosure, the termination of Martinez on the same date that appellant was reinstated totally demolished any impact the charges might have had. The placing of the November 27 letter in appellant's file does not bring this case within the ambit of Codd.
 
 
 39
 Nor were the statements in the August and November letters such as "might seriously damage (appellant's) standing and associations in his community." Board of Regents of State Colleges v. Roth, supra, 408 U.S. at 573, 92 S.Ct. at 2707. Anyone familiar with the situation, as were the persons to whom disclosure was made, must have known that Martinez's statements were the result of a split in the NEAMIDS' organization and a struggle for control between Martinez and appellant. The ultimate result was the reinstatement of appellant, the dismissal of Martinez, and the moving of NEAMIDS to the more hospitable climate of the City of Brotherly Love.
 
 
 40
 These were simply not the type of charges that would adversely affect appellant's good name and reputation in the Rhode Island educational community.[13] His present position as Assistant Principal at the West Warwick, Rhode Island, Junior High School belies any stigma as a result of the NEAMIDS affair. Moreover, as the district court noted, these cases that found a liberty interest infringement due to disclosure usually involved public meetings or the news media. See, e. g., Owen v. City of Independence, 560 F.2d 925, 936-37 (8th Cir. 1977), Vacated and remanded on other grounds, 438 U.S. 902, 98 S.Ct. 3118, 57 L.Ed.2d 1145 (1978); Staton v. Mayes, 552 F.2d 908, 911 n.6 (10th Cir.), Cert. denied, 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977) (public meeting with representatives of press present); Huntley v. Community School Board of Brooklyn, 543 F.2d 979, 983 (2d Cir. 1976), Cert. denied, 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 773 (1977) (public meeting); David Gonzalez v. Calero, 440 F.Supp. 989, 996 (D.C.P.R.1977) (newspaper publicity); Galaway v. Lawson, supra, 438 F.Supp. at 974 (newspaper publicity).
 
 
 41
 We find no defamation liberty interest infringement here that would trigger the necessity of a due process hearing before termination.
 
 
 42
 This leaves the state defamation claim which is a modified rerun of the liberty interest contention. There are two questions involved: whether the district court was correct in its determination that the publication of the alleged defamatory charges was protected under Rhode Island law by a "common interest" qualified privilege and, if it was, whether the district court's finding that Martinez's conduct was not primarily motivated by malice and, hence, did not overcome the qualified privilege was clearly erroneous.
 
 
 43
 Appellant does not quarrel with the Rhode Island law on a "common interest" qualified privilege as stated by the district court; it is its application that is contested. The base case is Ponticelli v. Mine Safety Appliance Co., 104 R.I. 549, 247 A.2d 303 (R.I.1968). The court defined the privilege as follows:
 
 
 44
 Preliminarily, we examine the qualified privilege concept. It permits a person to escape liability for a false and defamatory statement made about another if the occasion for the publication is such that the publisher acting in good faith correctly or reasonably believes that he has a legal, moral or social duty to speak out, or that to speak out is necessary to protect either his own interests, or those of third persons, or certain interests of the public. The occasion, of course, must not be abused. Underlying the principle is the public policy consideration that unless such an occasion is privileged, persons would not speak, even though the interests of the community at large required that they do so, lest they be exposed to a suit for defamation for what they might say. Correlatively, of course, there must be a reciprocity of duty between the publisher and the person to whom the publication is addressed, and the circumstances should reasonably demonstrate that the recipients have an interest in receiving it corresponding to that of the publisher in making it.
 
 
 45
 Id. at 305-06.
 
 
 46
 There remains the further problem of whether defendant unreasonably exercised the privilege. Clearly, of course, an occasion otherwise conditionally privileged cannot be sustained if the defamatory statements have been induced by malice. Tillinghast v. McLeon, 17 R.I. 208, 21 A. 345. The word "malice" as we use it " * * * does not mean malice in law, or the absence of legal excuse, but malice in the popular sense, the motive of personal spite or ill will. This is sometimes called express or actual malice." Hayden v. Hasbrouck, supra, 34 R.I. 556, at 562, 84 A. 1087, at 1089-1090.
 
 
 47
 Id. at 308. In Ponticelli, the court found that an employer was privileged to disclose to its employees the fact that the plaintiff was discharged for padding production figures since such disclosure acted as a deterrent to similar conduct in the future. In a subsequent case, Swanson v. Speidel Corporation, 110 R.I. 335, 293 A.2d 307, 310 (R.I.1972), the court stated: "It seems to us that the rationale in Ponticelli should apply with equal force to a situation involving prospective employers." In both Ponticelli and Swanson, the court emphasized that the question of malice was one of fact.
 
 
 48
 Appellant argues that publication to the federal officials of the letters, and particularly the dissemination of a copy of the November 27 letter to William Melody, did not involve a reciprocity of duty and, therefore, there was no qualified privilege. We disagree. The officials that received copies of the letter were all directly or indirectly a part of the national AMIDS organization. Melody was the regional director of a similar program elsewhere. While he had no direct control or supervisory function as to NEAMIDS, he was part of the national organization and had a real interest in knowing what was going on in the other regions.
 
 
 49
 We cannot say on our examination of the record that the district court was clearly erroneous in finding that "plaintiffs have failed to establish that malice was the primary motive for Dr. Martinez's disclosure." We can almost take judicial notice of the fact that filing letters and sending out copies is a reflex bureaucratic action.
 
 
 50
 We therefore affirm the district court on the state defamation claim.
 
 
 51
 Affirmed.
 
 
 
 [1]
 NEAMIDS was a wholly federally funded program of the United States Office of Education. Its purpose, together with other regional offices nationwide, was to coordinate manpower programs and train staffs in the Northeast
 
 
 [2]
 No similar express promise was made to Santaniello, although, according to Santaniello's testimony, Martinez did represent that, as director, he, Martinez, would make the hiring and termination decisions
 
 
 [3]
 The contract stated in bold letters: "UNIVERSITY OF RHODE ISLAND" "Contract." It provided for employment on a calendar year basis for 1971, for a term "effective May 17, 1971-June 30, 1971 . . . (To December 31, 1971 if funds are available)." It further provided that the contractee, Ventetuolo, "agrees to render services to the University and to perform all the duties required in accordance with the rules and regulations of the University." It was signed by the President of URI and Ventetuolo, dated June 4, 1971, "cc" to Martinez
 
 
 [4]
 "Don Ventetuolo:
 Effective as of this date, your services will not be required by Northeast AMIDS. From your blatant insubordination in our previous discussions both in private and during staff meetings, where you have expressed open hostility and complete refusal to accept the commands of the director and have observably defied the directives of the national concept, I feel thoroughly justified in terminating your employment with Northeast AMIDS effective immediately.
 Accrued vacation time and compensatory days will be reviewed, and a termination check including two weeks severance pay will be sent to your home address.
 /s/ Rodolfo Martinez
 /s/ Dr. Rodolfo Martinez
 /s/ Director Northeast AMIDS
 cc: H. Matthews
 Cc: L. Walser"
 
 
 [5]
 The two persons to whom the August 22 letter was sent were Howard Matthews and Leroy Walser. Matthews was the National Director of Manpower, U.S. Office of Education. Walser was the National Director of the AMIDS program, U.S. Office of Education. Both had previously been apprised of the NEAMIDS conflict
 
 
 [6]
 Although the parties have not argued the point, the fact that appellant's suspension was with pay raises a question whether there was ever any deprivation of property during the dispute. We need not reach the question, however, in view of our holding, Infra, that appellant's entitlement never rose to the level of a property interest
 
 
 [7]
 Copies of this letter were sent to Dr. Howard Matthews, Mr. Leroy Walser, Dr. Fred G. Burke, Mr. Edward Conanty, Nicholas Handregen, and William Melody. Handregen was the Region 1 (New England) representative for the Manpower Program, U.S. Office of Education, Melody was Handregen's counterpart in Region 2 (New Jersey, New York, and Pennsylvania)
 
 
 [8]
 Eighteen charges were brought by Martinez. One was withdrawn before the hearing. The sixteen unproven charges included: unauthorized out-of-state and other trips; unsatisfactory completion of assignments; talking to newly appointed staff members about "two theories of administration" within NEAMIDS; failure to keep scheduled appointments; failure to inform the Director that he was going out-of-state; failure to issue reports; failure to follow through on assignments; making an interviewee wait in his office for an extended period of time; failure to give staff members certain requested information; excluding the Director from receipt of a memorandum; change of agenda without sufficient notice; improper use of a telephone credit card; failure to give the Director a copy of a proposal; failure to follow through on a request; hiring a consultant without consulting with the Director; given a staff member an assignment outside the staff member's expertise or capabilities; and loud activity at a Christmas party
 
 
 [9]
 R.I.Gen.Laws § 16-49-7 (1956, as amended) reads, in pertinent part: "Within such department (Education), the appointment, Promotion, salaries, term of service And dismissal of all professional employees, including instructional and research employees, and administrative employees and secretaries Shall be at the pleasure of the commissioner of education, . . ." (emphasis supplied)
 
 
 [10]
 This is so even where the agreement of service provided that the employee would receive a fixed sum for a stated period of service. Booth v. National India Rubber Co., 19 R.I. 696, 36 A. 714 (1897)
 
 
 [11]
 The 1972 proposal outlining the organizational structure of NEAMIDS after it ended its affiliation with URI is not in the record. Appellant's testimony indicated that direct ties to the State Department of Education were strengthened
 
 
 [12]
 For a discussion of estoppel in the context of a civil rights employment dismissal action, See Willens v. University of Massachusetts, 570 F.2d 403, 404-05 (1st Cir. 1978)
 
 
 [13]
 The cases that have found a liberty interest usually involved serious and specific charges: Judith Rodriguez de Quinonez v. Cesar Perez, 596 F.2d 486 (1st Cir. 1979) (bank directors discharged for dishonesty); Greenhill v. Bailey, 519 F.2d 5 (8th Cir. 1975) (lack of intellectual ability as distinguished from performance); Rolles v. Civil Service Commission, 168 U.S.App.D.C. 79, 512 F.2d 1319 (1975) (fraud and dishonesty); Lombard v. Board of Education, 502 F.2d 631 (2d Cir. 1974) Cert. denied, 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975) (mental illness); Wellner v. Minnesota State Junior College, 487 F.2d 153 (8th Cir. 1973) (racism); McNeill v. Butz, 480 F.2d 314 (4th Cir. 1973) (dishonesty)
 The charges here are akin to those in the following cases which were held not to implicate a defamation liberty interest: Mazaleski v. Truesdell, 183 U.S.App.D.C. 182, 562 F.2d 701 (1970); Stretten v. Wadsworth Veterans Hospital, 537 F.2d 361 (9th Cir. 1976) (incompetence, inability and unwillingness to deal with co-workers in a professional manner); Lake Michigan Community College Federation of Teachers v. Lake Michigan Community College, 518 F.2d 1091 (6th Cir. 1975), Cert. denied, 427 U.S. 904, 96 S.Ct. 3189, 49 L.Ed.2d 1197 (1976) (breaking state law by striking); Abeyta v. Town of Taos, 499 F.2d 323 (10th Cir. 1974) (charges of improper and substandard job performance); Blair v. Board of Regents, 496 F.2d 322 (6th Cir. 1974) (failure to meet minimum standards); Adams v. Walker, 492 F.2d 1003 (7th Cir. 1974) (incompetence, neglect of duty and malfeasance in office); Jeffries v. Turkey Run Consolidated School District, 492 F.2d 1 (7th Cir. 1974) (highly unethical conduct); Shirck v. Thomas, 486 F.2d 691 (7th Cir. 1973) (unsatisfactory performance); Clark v. Holmes, 474 F.2d 928 (7th Cir. 1972), Cert. denied, 411 U.S. 972, 93 S.Ct. 2148, 36 L.Ed.2d 695 (1973) (deficiencies in a teacher's professional conduct); Russell v. Hodges, 470 F.2d 212 (2d Cir. 1972) (sleeping on duty, absence from duty without authorization and wearing improper attire).