Elaine PERKINS, Plaintiff,

v.

The BOARD OF DIRECTORS OF SCHOOL · ADMINISTRATIVE DISTRICT NO. 13, et al., Defendants.

Civ. No. 76–109 P.

United States District Court,
D. Maine.

Dec. 31, 1981.

Stephen P. Sunenblick and Donald F. Fontaine, Portland, Maine, for plaintiff.

Harry S. Pringle and Hugh G. E. MacMahon, Portland, Maine, for defendants.

1. On the eve of trial, plaintiff dismissed as a defendant John Morrison, Principal of the Upper Kennebec Valley Memorial High School.

* References to plaintiff's and defendants' trial exhibits will be designed as (P– ) or (D– ); references to exhibits received at the May 6 and May 13, 1976 School Board hearings, *post*, will be designed as (5/6– ) or (5/13– ).

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND DIRECTION FOR ENTRY OF JUDGMENT

GIGNOUX, Chief Judge.

This is a civil rights action under 42 U.S.C. § 1983 brought by a former half-time home economics teacher employed by School Administrative District No. 13 (S.A.D. No. 13) in Bingham, Maine, against the Board of Directors, certain members of the Board in their official capacities, and the Chairman of the Board and Superintendent of Schools in their official and individual capacities.[1] Jurisdiction is predicated on 28 U.S.C. §§ 1331 and 1343. Plaintiff alleges that the manner in which the Board's decision not to renew her teaching contract for the 1976–77 school year was made denied her the procedural and substantive due process guaranteed by the Due Process Clause of the Fourteenth Amendment. She seeks injunctive relief, including reinstatement in her teaching position, damages, attorney's fees and costs.

The action has been tried to the Court, without jury, and the issues have been comprehensively briefed and argued by counsel. Having considered the evidence and the written and oral arguments of counsel, the Court now makes its findings of fact and conclusions of law, and directs entry of its judgment as follows:

### FINDINGS OF FACT

The Court's findings of fact are:

1. During the 1975–76 school year, plaintiff Elaine Perkins was employed by S.A.D. No. 13 as a half-time home economics teacher at the Upper Kennebec Valley Memorial High School, Bingham, Maine, under a standard one-year continuing contract (D–8).*[2] At all material times plain-

2. Plaintiff had been employed as a full-time home economics teacher since September 1964. In February 1975, the defendant Board reduced plaintiff's full-time position to a half-time position for the school year 1975–76 because of budgetary constraints and the small student enrollments in her classes. Plaintiff filed a grievance under the collective bargaining agreement between S.A.D. No. 13 and UKVTA. Her grievance was dropped during the summer

tiff was a member of the Upper Kennebec Valley Teachers Association (UKVTA) and the Maine Teachers Association (MTA).

2. S.A.D. No. 13 is a quasi-municipal corporation under the laws of the State of Maine. At all material times defendants Reginald McCollor, Theresa Davis, Norman Dionne, Bryan Malloy, Susan Melcher, Christine Brown, Elvin Hawes, and John Birdsall were members of the Board of Directors of S.A.D. No. 13; defendant Reginald McCollor was Chairman of the Board of Directors; defendant Paul Hurlburt was Superintendent of Schools in S.A.D. No. 13; and John Morrison was Principal at the Upper Kennebec Valley Memorial High School.

3. At all material times the terms and conditions of employment for all teachers employed by S.A.D. No. 13 were governed by collective bargaining contracts between UKVTA and the District (D–11, 12, 13, 14). The collective bargaining contract in effect from September 1, 1974 through August 31, 1976 (D–11) contained the following provision:

ARTICLE IV—TEACHER RIGHTS

. . . .

B. No teacher shall be formally disciplined, reduced in rank or compensation, or deprived of any professional advantage including nonrenewal of contract without written reasons.

4. Hurlburt assumed his duties as Superintendent of Schools in S.A.D. No. 13 in June 1975. One of his first concerns was the status of the half-time home economics position held by plaintiff. In investigating the reasons for the reduction of the position to half-time, he reviewed the extremely low high school student enrollments in plaintiff's classes: although there were approxi-mately 170 high school students during the 1974–75 and 1975–76 school years, in neither year did the high school enrollment in plaintiff's classes exceed 20 to 22 students. Hurlburt was also concerned that, because of the low enrollments and other deficiencies in the program, that the Maine Department of Educational & Cultural Services had terminated the federal subsidy for the home economics program for the 1975–76 school year. On September 8, 1975, Hurlburt discussed with plaintiff this problem and its relationship to her teaching. He indicated to plaintiff that before he could recommend the position be made full-time again, there would have to be substantial improvement in the program and increased student interest.

5. During the fall of 1975 Hurlburt and Morrison evaluated plaintiff's teaching on numerous occasions. These evaluations revealed serious teaching deficiencies substantiating the reasons suggested by the Maine Department of Educational & Cultural Services for the low student enrollment, namely, the lack of a challenging program and general student apathy.

6. On December 10, 1975, Hurlburt and Morrison discussed with plaintiff their concerns about her teaching performance and informed her that Hurlburt would not recommend the renewal of her teaching contract unless her performance improved substantially. On January 7, 1976, Morrison wrote a formal letter to plaintiff setting forth his concerns with her classroom teaching and the important points that would have to be improved before the issuance of contracts in February (5/6–32). On January 14, plaintiff forwarded to Morrison a letter drafted by the MTA Uniserv Director, Stewart Kinley, requesting more details with respect to Morrison's concerns

of 1975 when UKVTA filed a prohibited practice complaint against S.A.D. No. 13 with the Maine Labor Relations Board regarding the elimination of several teaching positions. The Maine Labor Relations Board ultimately dismissed the prohibited practice complaint when UKVTA failed to file requested documents in a timely fashion.

In the fall of 1975, plaintiff filed another grievance alleging she was in fact working more than half-time in her half-time position and therefore should receive additional pay and fringe benefits (D–10). This grievance went to arbitration in Augusta, Maine on March 23, 1976. After a full hearing, the arbitrator denied the grievance, ruling that the Board had not violated the collective bargaining agreement. *Id.*

(5/6–30). On January 16, Hurlburt and Morrison again met with plaintiff to discuss her January 14 letter. Hurlburt again told plaintiff that, if improvements were not made, he would definitely not recommend renewal of her contract. On January 19, Morrison formally replied to plaintiff's January 14 letter (5/6–28).

7. When Hurlburt became aware that plaintiff had been sharing the contents of Morrison's January 19 letter with the Bingham community, he called a special Board meeting for January 22. Both Hurlburt and McCollor notified plaintiff she had the right to be present at the meeting.[3] At the January 22 meeting Morrison's January 19 letter was read to the Board. Hurlburt also discussed his concerns regarding plaintiff's teaching performance. When asked for comments, plaintiff stated that she had a very difficult time working with Morrison; that she did not trust him; that she could not work with him; and that he lied to her. Morrison nevertheless stated he had recently observed an excellent class given by plaintiff, which he felt indicated an attempt to improve.

8. On the following day, January 23, Hurlburt went to plaintiff's classroom. Referring to Morrison's recent observation, he indicated to plaintiff that perhaps her relationship with Morrison was not as bad as she had stated and that Morrison's observation showed he could be fair. Plaintiff

shouted at Hurlburt to get out, saying that she had taken all the "shit" from him she was going to take.[4]

9. By January 1976 the professional relationship between plaintiff and Morrison had seriously deteriorated. As described by Morrison, they "were not on a communicating basis"; communications were either through third persons or in writing; and on the few occasions when they met in person, plaintiff insisted on the presence of a third party.[5] Morrison informed Hurlburt of the impossible relationship between him and plaintiff.

10. In a written evaluation dated January 30, 1976, Morrison recommended that plaintiff be offered a contract for the following year conditioned upon satisfactory improvement in her performance during that year (5/6–24). Because Morrison's recommendation was based on only one good classroom observation, Hurlburt asked Morrison to review all his evaluations to see if he still felt plaintiff's contract should be renewed.

11. On February 23, 1976, Hurlburt informed plaintiff that he was unable to recommend her for a teaching contract for the 1976–77 school year. He discussed with her his final written evaluation of her teaching performance (5/6–22), setting forth the reasons for his recommendation: plaintiff was extremely defensive and did not seek advice concerning her program, showed little ini-

3. Plaintiff asked to have her husband attend the meeting, but McCollor responded that only she could attend because of the Board's practice that only the person being discussed could be present at an executive session.

4. Following the January 23 incident, McCollor telephoned plaintiff to inquire about what had happened. Plaintiff denied making the statements attributed to her by Hurlburt. McCollor then cautioned plaintiff about the "snowballing effect" of the exchange of correspondence between her and Morrison, which, as plaintiff acknowledged, was only adding fuel to the fire. Although plaintiff testified that in the same telephone conversation McCollor told her the Board members were laughing at her evaluations and that she need not worry about the renewal of her contract, McCollor unequivocally denied making any such statements. The Court rejects plaintiff's testimony in this re-

gard. It was at this point in the trial that it was disclosed that plaintiff was testifying, not from memory, but substantially verbatim from a detailed 19-page outline of testimony prepared by her counsel (D–19). The Court felt compelled to admonish counsel that this was a dangerous practice which could not be condoned. *See* 3 Wigmore on Evidence § 759 at 131 (Chadbourn Rev. 1970).

5. At a meeting in Morrison's office in July 1975, at which plaintiff's husband was also present, plaintiff had called Morrison a "gooseneck" and an "ass." In December 1975, during a meeting between Morrison, plaintiff and the guidance·counselor, Gary Crook, plaintiff refused to talk to Morrison directly and insisted upon conversing with him through Crook, so that Crook had to repeat plaintiff's statements to Morrison.

tiative in following program recommendations until very recently, was unable to look at herself objectively, felt that her principal was "out to get her," had sketchy lesson plans, and did not effectively present her subject to her students. Hurlburt's conclusion was that while plaintiff had shown some improvement of late, in general this improvement was "too little, too late." *Id.*

12. On February 25, 1976, the Board met in executive session for its annual review of the evaluations of all continuing contract teachers. At that meeting, which plaintiff attended, Hurlburt recommended that plaintiff not be offered a contract for the 1976–77 school year.[6] The Board accepted Hurlburt's recommendation and voted not to renew plaintiff's contract.

13. By letter dated February 26, 1976 (D–6), Hurlburt formally notified plaintiff of the Board's vote not to renew her contract. His letter stated that the Board's decision was based on the following seven reasons: 1) laxity in planning lessons; 2) ineffectiveness in carrying out lessons; 3) constant insubordinate attitude to principal; 4) inappropriate reactions to administrative directions and failure to follow recommendations; 5) lack of self-control; 6) ineffectiveness in motivating students; 7) lack of judgment in discussions with students. Accordingly, Hurlburt advised plaintiff her employment would terminate as of August 31, 1976.

14. Following receipt of Hurlburt's February 26 letter, plaintiff's counsel, Stephen P. Sunenblick, Esq., and her MTA representative, Stewart Kinley, requested a hearing before the Board pursuant to 20 M.R.

S.A. § 161(5) (5/6–19, 21). At Sunenblick's request, the hearing, originally scheduled for April 8 (5/6–9), was postponed until May 6 in order to accommodate his schedule and to allow him ample time to prepare (5/6–6).[7] Sunenblick also demanded detailed discovery with respect to the reasons for the Board's action (5/6–12). In response to the discovery demand, Hurlburt and the Board's counsel, Hugh MacMahon, Esq., met with Sunenblick in Augusta and reviewed the evidence to be presented by Hurlburt at the Board hearing. The meeting lasted two to three hours. Sunenblick was informed of the evidence intended to be placed in evidence at the hearing and confirmed in a five-page single-spaced letter to Hurlburt his understanding of the reasons for the nonrenewal recommendation and the evidence intended to be used to substantiate those reasons (5/6–5).

15. Plaintiff's hearing before the Board commenced on May 6, 1976, at 7:04 p. m., adjourned at 11:43 p. m. that night, was reconvened on May 13 at 7:04 p. m., and concluded at 12:28 a. m. on May 14. The proceedings were transcribed by a registered professional reporter employed by the Board. The two-volume transcript of the hearing (D–18) totaled 480 pages, including 370 pages of transcript proceedings and 110 pages of exhibits. McCollor, as Chairman of the Board, presided, with the assistance of the Board's counsel, Mr. MacMahon. Plaintiff was represented by her counsel, Mr. Sunenblick, and by her MTA representative, Mr. Kinley. Although plaintiff requested an open hearing, the Board voted for a closed hearing pursuant to 20 M.R.

---

**6.** Morrison also presented his January 30 evaluation to the Board, but indicated that upon reflection he supported Hurlburt's recommendation of nonrenewal. Despite her earlier statements to the Board at the January 22 meeting, plaintiff stated that she could indeed work with Morrison, but would now have trouble working with Hurlburt.

**7.** In the meantime, McCollor had telephoned plaintiff in an attempt to set up a meeting with her. Plaintiff stated she wished an MTA representative to be present. McCollor indicated he did not wish to have such a representative present. After checking with her MTA repre-

sentative, plaintiff informed McCollor she would be willing to meet with him, but McCollor replied that he had decided to turn the matter over to legal counsel.

Again consistently with the trial notes prepared by her counsel (D–19), plaintiff testified that during these telephone conversations McCollor indicated that the Board had already made up its mind, that she should not pursue her hearing request, and that she should resign quietly. McCollor flatly denied these allegations, and the Court cannot credit plaintiff's unsubstantiated charges to the contrary.

S.A. § 161(5). The Board member who made the motion for a closed hearing stated that he was doing so because he felt that matters critical of plaintiff would be disclosed and a private meeting would be in plaintiff's best interests. The Board was told to consider only those exhibits which had been identified to Sunenblick a month earlier, and any observations or other documents referred to in testimony which had not previously been provided to Sunenblick were stricken from the record at his request, and MacMahon instructed the Board not to consider them in any way. At Sunenblick's request, all witnesses were sequestered.

16. At the outset of the first night of the hearing, MacMahon instructed the Board that it was required to maintain an open mind during the hearing, that they were required by their oath of office to act fairly and to make a fair judgment on the basis of the evidence, and that the purpose of the hearing was to hear both sides of the matter so that the Board could thereafter make the decision. MacMahon again reminded the Board of its obligations in this regard at the second night of the hearing.

17. At the May 6 hearing Sunenblick consumed nearly an hour with a lengthy argument of objections to the constituency of the Board and the procedures which had been set for the conduct of the hearing.[8] Hurlburt then read his statement presenting his reasons for recommending nonrenewal, with supporting documentation. Hurlburt's statement took approximately one-half hour. The balance of the evening, approximately two and one-half hours, was occupied by Sunenblick's rambling cross-examination of Hurlburt. Although Sunenblick initially insisted that the hearing con-

clude at 10:00 p. m., he consistently refused to respond to the chairman's requests for estimates of the time he would require to complete his cross-examination of Hurlburt and to present his case.[9] By 10:45 p. m., it had become evident that it would be necessary for the Board to establish time limits for the testimony of witnesses so that the hearing would not be unduly prolonged. Accordingly, after consulting with MacMahon, the Board at 11:30 p. m. decided to adjourn the meeting to May 13 and established time limits for further testimony. It granted Sunenblick an additional one-half hour for cross-examination of Hurlburt; one-half hour for Morrison's statement; Sunenblick one-half hour for cross-examination of Morrison; one-half hour for Board questions; Sunenblick two hours for the presentation of plaintiff's case; and one-half hour for cross-examination of plaintiff's witnesses.[10] The May 6 hearing then adjourned.

18. The May 13 hearing proceeded under the previously established guidelines. Sunenblick continued cross-examination of Hurlburt for an additional one-half hour. Morrison presented his statement and was cross-examined by Sunenblick for over 40 minutes. Following brief examination of Hurlburt and Morrison by MacMahon and the Board, Sunenblick was granted additional time for recross examination of Morrison. Plaintiff began her direct testimony at 9:40 p. m. and her examination by Sunenblick continued for two full hours. Sunenblick then called her former principal, Walter H. Reed, who testified briefly concerning previous evaluations of plaintiff. Plaintiff was then recalled for examination by members of the Board and Hurlburt.

8. An objective review of the transcript of the May 6 and May 13 hearings leads to the inescapable conclusion that Sunenblick conducted himself throughout in such an aggressive, hostile and obstreperous manner as to make the orderly conduct of the proceedings extremely difficult, if not impossible.

9. Shortly after 10:00 p. m., Sunenblick stated he would "warm up about midnight." At one point, when MacMahon suggested that at the rate Sunenblick was conducting his cross-ex-

amination, the hearing could well last for ten days, Sunenblick replied, "It is possible."

10. Having reviewed the entire transcript of the May 6 and May 13 Board hearings, the Court expressly finds that the time limits and procedural rules established by the Board were both reasonable and necessary because of the obstreperous conduct and dilatory tactics of plaintiff's counsel.

At 12:24 a. m., Sunenblick was granted ten additional minutes for redirect examination of plaintiff. Without using the full time alloted, he then terminated plaintiff's case with the statement, "I have nothing further." The hearing adjourned at 12:28 a. m.[11]

19. After deliberating for a short time following the close of the second hearing, the Board adjourned at 1:07 a. m., and again met on May 20 in executive session to continue their deliberations.[12] Upon the completion of the Board's deliberations, Hurlburt, as Secretary to the Board, recorded the Board's decision (D–5) (P–14). The decision was then read to and signed by each Board member. Plaintiff was notified of the decision by a letter dated May 21, 1976 (D–7), which had been prepared by Hurlburt and which was signed by each of the Board members. This letter informed plaintiff that the Board had voted not to renew plaintiff's contract for the 1976–77 school year, and that the Board's decision was "based on each and all of the following findings which support the reasons listed 1, 2, 3, 4, and 5" in Hurlburt's February 26, 1976, letter to plaintiff: (a) lack of adequate planning resulting in ineffective teaching; (b) insubordinate attitude towards principal; (c) unwillingness to work with administration; and (d) insubordinate

and abusive language; shouting at the Superintendent of Schools in your classroom on January 23, 1976: "I am not going to take any more of your shit!" Id.[13]

20. In accordance with the Board's decision, plaintiff's employment by S.A.D. No. 13 terminated on August 31, 1976.

21. The reasons for the Board's decision not to renew plaintiff's teaching contract for the school year 1976–77 were those set forth in the Board's May 21, 1976 letter to plaintiff (D–7). The decision was made in good faith and was not based on reasons that were either arbitrary or capricious.

22. The decision of the Board not to renew plaintiff's contract for the school year 1976–77 and the findings upon which that decision was based were adequately supported by substantial evidence, both at the May 6 and May 13 Board hearings, and at the four-day trial before this Court.

## DISCUSSION

The essence of plaintiff's claim is that she was denied procedural due process by the decision of the defendant Board not to renew her teaching contract for the 1976–77 school year.[14] In order to prevail on this claim, plaintiff must establish that the Board's action deprived her of a "property" or a "liberty" interest protected by

11. At trial plaintiff testified she did not have sufficient time to present her evidence at the hearing. She said she wanted to call as additional witnesses her husband, the guidance counselor, Mr. Crook, and a fellow teacher, Mrs. Donna Smith. At no time during the course of the May 6 or May 13 hearing did her counsel make an offer of proof as to the testimony of these proposed witnesses. Indeed, at the May 13 hearing Sunenblick indicated Crook had refused to be present without a subpoena, and on cross-examination at trial, plaintiff herself was unable to testify that she had asked any witnesses to appear at the hearing other than Reed, who in fact did testify. Plaintiff's husband testified at trial, and it is evident that his testimony at the hearing would have been entirely cumulative.

12. At no time following the adjournment of the second hearing were any persons other than Board members present with the Board while it was deliberating. Hurlburt and MacMahon left within two or three minutes after the close of the May 13 hearing. Hurlburt was present

with the Board only at the start of the May 20 meeting. He reminded the Board of their responsibilities and then left, asking the Board to call him back when it had arrived at a decision. At the conclusion of the Board's deliberations on May 20, Hurlburt was asked to return to the meeting to record the Board's decision.

13. Hurlburt testified that the Board's decision was intentionally not made public and was not attached to the Board's minutes in order to protect plaintiff's privacy.

14. Plaintiff has not made even a colorable showing that the Board's decision denied her substantive due process, or that her contract was not renewed because of an exercise of her First Amendment right to free speech or for any other constitutionally impermissible reason. See Board of Regents v. Roth, supra, 408 U.S. at 575 n.14, 92 S.Ct. at 2708 n.14; Perry v. Sindermann, supra, 408 U.S. at 596–98, 92 S.Ct. at 2697–2698.

the Fourteenth Amendment. *Board of Regents v. Roth,* 408 U.S. 564, 569–72, 92 S.Ct. 2701, 2705–2706, 33 L.Ed.2d 548 (1972). Plaintiff has failed to establish the existence of either of these interests:

(1) To establish a "property" interest, plaintiff must show a "legitimate claim of entitlement" to continued employment either under a statutory or contractual provision, *Board of Regents v. Roth, supra,* 408 U.S. at 576–78, 92 S.Ct. at 2708–2709, or under a de facto tenure policy, *Perry v. Sindermann,* 408 U.S. 593, 599–603, 92 S.Ct. 2694, 2698–2700, 33 L.Ed.2d 570 (1972). *See also Ventetuolo v. Burke,* 596 F.2d 476, 480–81 (1st Cir. 1979); *Willens v. University of Massachusetts,* 570 F.2d 403, 405 (1st Cir. 1978). Whether plaintiff has such an interest "must be decided by reference to state law." *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); *Hagopian v. Trefrey,* 639 F.2d 52, 53 (1st Cir. 1981).

Here, neither Maine law nor plaintiff's employment contract provided her with the right to continued employment, and the record is devoid of evidence that there existed in the District any practice or policy with respect to reemployment which would amount to a de facto tenure policy. Plaintiff bases her claim on 20 M.R.S.A. § 161(5), the Maine teacher nonrenewal statute.[15] Section 161(5) only provides, however, that a nonprobationary teacher whose contract is not to be renewed is entitled to notice of nonrenewal at least six months before the terminal date of the contract and, if requested, a statement of reasons and a hearing before the school board. Section 161(5) does not provide for contract renewal absent "sufficient cause." *See Board of Regents v. Roth, supra,* 408 U.S. at 578, 92 S.Ct. at 2709–2710. While Maine law does require "cause" for the dismissal of a teacher during the term of a contract, *see* 20 M.R.S.A. § 473(4),[16] Section 161(5) contains no such provision.[17] It is now

**15.** Section 161(5) reads in relevant part:

After a probationary period of not to exceed 2 years, subsequent contracts of duly certified teachers shall be not for less than 2 years. Unless a duly certified teacher receives written notice to the contrary at least 6 months before the terminal date of the contract, the contract shall be extended automatically for one year and similarly in subsequent years although the right to an extension for a longer period of time through a new contract is specifically reserved to the contracting parties.... After a probationary period of 2 years, any teacher, who receives notice in accordance with this section that his contract is not going to be renewed, may during the 15 days following such notification request a hearing with the school committee or governing board. He may request reasons. The hearing shall be private except by mutual consent and except that either or both parties may be represented by counsel. Such hearing must be granted within 30 days of the receipt of the teacher's request.

**16.** Section 473(4) provides in relevant part:

*4. Teachers dismissed.* After investigation, due notice of hearing, and hearing thereon, they shall dismiss any teacher, although having the requisite certificate, who proves unfit to teach or whose services they deem unprofitable to the school; and give to said teacher a certificate of dismissal and of the reasons therefor, a copy of which they shall retain.

**17.** The relevant legislative history shows that the Maine legislature has consistently rejected teacher tenure bills. On three occasions during the past 40 years the Maine legislature has considered and rejected bills that would have required the establishment of a specified cause for the dismissal, demotion or contractual nonrenewal of nonprobationary public school teachers. For the proposed bills and pertinent legislative history, see (1) Legislative Document No. 272, 104th Legislature (1969), and [1969] Maine Legislative Record 2043; (2) Legislative Document No. 896, 95th Legislature (1951), and [1951] Maine Legislative Record 1006; and (3) Legislative Document Nos. 506, 1095, 90th Legislature (1941), and [1941] Maine Legislative Record 702, 900–09, 1051–52, 1093–1107, 1137, 1219, 1333, 1365.

Contrary to plaintiff's assertion, the Maine court has never held that a teacher's contract must be renewed in the absence of "just cause" for nonrenewal. Indeed, in *Lovejoy v. Grant,* 434 A.2d 45 (Me.1981), the Maine court's most recent discussion of Section 161(5), that court explicitly differentiated between Section 161(5), the teacher nonrenewal statute, and Section 473(4), the teacher dismissal statute, noting that while the former entitled teachers to "certain procedural and substantive protections concerning nonrenewal of their contract," the latter "restricts the grounds" on which a teacher may be discharged in the course of a contract. *Id.* at 50.

established that a public employee has no property interest sufficient to invoke the Fourteenth Amendment's due process guarantees unless the applicable statute or employment contract requires that employment may only be terminated upon a showing of "cause." *Bishop v. Wood, supra*, 426 U.S. at 345–47, 96 S.Ct. at 2077–2078; *Arnett v. Kennedy*, 416 U.S. 134, 167 n.2, 94 S.Ct. 1633, 1650 n.2, 40 L.Ed.2d 15 (1974) (Powell, J., concurring); *Board of Regents v. Roth, supra*, 408 U.S. at 578, 92 S.Ct. at 2709–2710; *Perry v. Sindermann, supra*, 408 U.S. at 601, 92 S.Ct. at 2699; *Beitzell v. Jeffrey*, 643 F.2d 870, 874 (1st Cir. 1981); *Hagopian v. Trefrey, supra*, 639 F.2d at 53–54; *Ventetuolo v. Burke, supra*, 596 F.2d at 481. Plaintiff therefore had no statutory right to continued employment which was safeguarded by procedural due process. And since plaintiff's employment contract merely incorporated the statutory terms, plaintiff had no property interest arising from the contract.

(2) To establish that she was deprived of a "liberty" interest, plaintiff must show that the Board, in declining to extend her employment contract, made a charge against her "that might seriously damage [her] standing and associations in [her] community," or that the Board imposed on her "a stigma or other disability that foreclosed [her] freedom to take advantage of other employment opportunities." *Board of Regents v. Roth, supra*, 408 U.S. at 573, 92 S.Ct. at 2707; *Bishop v. Wood, supra*, 426 U.S. at 347–48, 96 S.Ct. at 2078–2079; *Beitzell v. Jeffrey, supra*, 643 F.2d at 877–79; *Ventetuolo v. Burke, supra*, 596 F.2d at 482–84. But "[m]ere proof, for example, that [her] record of nonretention in one job, taken alone, might make [her] somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.'" *Board of Regents v. Roth, supra*, 408 U.S. at 574 n.13, 92 S.Ct. at 2707 n.13; *Ventetuolo v. Burke, supra*, 596 F.2d at 483.

In the present case, the reasons asserted by the Board for the nonrenewal of plaintiff's contract were ineffective job performance and inability to work with her supervisors in a professional manner. The Board did not base the nonrenewal of plaintiff's contract on a charge that she had been guilty of dishonesty, or immorality, or other egregious conduct. *See Board of Regents v. Roth, supra*, 408 U.S. at 573, 92 S.Ct. at 2707; *Willens v. University of Massachusetts, supra*, 570 F.2d at 405–06. Moreover, the Board in no way publicized its action. *See Bishop v. Wood, supra*, 426 U.S. at 348, 96 S.Ct. at 2079; *Willens v. University of Massachusetts, supra*, 570 F.2d at 406. The Board's decision and the findings on which it was based were communicated to plaintiff privately, both orally and in writing, and were not made public. In fact, the Board insisted, over plaintiff's objection, that the hearing be conducted in executive session in order to protect plaintiff from adverse publicity. On this record, plaintiff has not made out a claim of deprivation of a constitutionally protected "liberty" interest.

Plaintiff having failed to show that the Board's decision deprived her of any constitutionally protected "property" or "liberty" interest, it is unnecessary for the Court to consider her further contention that she was denied procedural due process by the manner in which the Board arrived at the nonrenewal decision. Nevertheless, the Court feels compelled to observe that, even were there a protected "property" or "liberty" interest at stake, plaintiff received in full measure the process that was her due. She was informed in writing of the reasons for the Board's initial nonrenewal decision in February 1976. Her request for a hearing before the Board was honored. Her counsel was granted extensive discovery and substantial time to prepare for the hearing. At the hearing she was represented by counsel and provided the opportunity to cross-examine witnesses, to introduce evidence and to offer her own testimony. In light of the dilatory tactics of her counsel, the time limitations on the

presentation of evidence imposed by the Board were consistent with due process and the right of any tribunal to maintain reasonable control over the course of proceedings before it. *See, e.g.,* Fed.R.Evid. 611(a). She was provided with written findings of fact supporting the reasons for the ultimate nonrenewal decision. Nor was plaintiff denied due process because the Board had some prehearing familiarity with the charges against her. Section 161(5) requires the Board itself to vote not to renew a teacher's contract and to notify the teacher of the reasons for its vote. *See Beattie v. Roberts,* 436 F.2d 747, 750–51 (1st Cir. 1971). It has been consistently held that previous contact with a case in discharge of a statutory duty does not disqualify the members of a school board or other tribunal, absent a clear showing of a personal or financial stake in the proceedings sufficient to create a conflict of interest. *Hortonville Joint School District No. 1 v. Hortonville Education Association,* 426 U.S. 482, 493, 96 S.Ct. 2308, 2314, 49 L.Ed.2d 1 (1976); *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975); *O'Brien v. DiGrazia,* 544 F.2d 543, 546–47 (1976), *cert. denied sub nom. O'Brien v. Jordan,* 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). Plaintiff has made no showing that any member of the Board had such a personal or financial stake in this case.

### CONCLUSIONS OF LAW

The Court's conclusions of law are:

(1) This Court has jurisdiction of this action and of the parties hereto. 28 U.S.C. §§ 1331, 1343(a)(3).

(2) The decision of the defendant Board not to renew plaintiff's teaching contract for the 1976–77 school year did not deprive her of a "property" or a "liberty" interest protected by the Fourteenth Amendment.

(3) The manner in which the Board decided not to renew plaintiff's teaching contract for the 1976–77 school year conformed to the procedural and substantive due process requirements of the Fourteenth Amendment.

(4) The Board's decision not to renew plaintiff's teaching contract for the 1976–77 school year was not based upon any constitutionally impermissible ground and did not violate plaintiff's First Amendment right of free speech.

(5) Plaintiff is not entitled to recover of defendants in this action.

### DIRECTION FOR ENTRY OF JUDGMENT

In accordance with the foregoing findings of fact and conclusions of law, it is

ORDERED, ADJUDGED and DECREED that judgment be entered for the defendants against the plaintiff dismissing the action with prejudice and with costs, and the Clerk of this Court is hereby directed to make entry of such judgment forthwith.