St. Louis, Iron Mountain & Southern Railway Company

*v.* Matthews.

Opinion delivered November 6, 1897.

Contract—Divisibility.—A contract between a railroad company and its locomotive engineers stipulated (1) that no engineer should be discharged except for cause, and (2) that any discharged engineer should be reinstated if the arbitrators provided by the contract should find that his discharge was unjust. *Held,* that if the second stipulation was void as contrary to public policy, it may be eliminated without affecting the first stipulation. (Page 405.)

Same—Mutuality.—An agreement between employer and employee that the latter shall not be discharged without cause, without any agreement on the part of the employee to serve for any specified time, is not enforceable. (Page 406.)

Appeal from Pulaski Circuit Court, First Division.

Robert J. Lea, Judge.

*Dodge & Johnson,* for appellants.

Common carriers are held to a strict accountability for the acts and defaults of their servants. 34 Ark. 613; 43 Ark. 298; 60 Ark. 381. It is against public policy to make any contract whereby the railroad company would be in any way

hindered or restricted in the discharge of the duty which it owes to the public to employ only competent and careful servants. Such a contract is void. 22 W. Va. 600; 4 Humph. (Tenn.) 199; 4 Ohio, 400–419; 56 Me. 455; 4 H. L. Cas. 1; Greenhood, Public Policy, 126, 306, 316, 320; Bishop, Noncontract Law, p. 1074; *ib.* § 549; Bishop, Contracts, 473; 50 Ill. 138; 120 U. S. 663; 18 Pick. 472; 103 U. S. 261, 267, 273; 2 Wall. 45; 89 Ill. 351; 57 Mich. 394; Cooley, Torts, 607; 11 S. E. 829; 9 C. C. A. 664–5; 129 U.S. 657; 18 Pick. 472; 144 U. S. 233–4; 20 Wall. 451; 95 U. S. 660; 129 U. S. 440–1; 101 U. S. 71; 139 U. S. 51; 29 Kas. 169; 48 Ark. 460; 44 O. St. 476–9; 2 Bos. & Pull. 374; 3 Barn. & Ald. 183; 7 Me. 390; 3 Cush. 448; 21 Wall. 448; 101 U. S. 77; 139 *ib.* 34; S. C. 11 Sup. Ct. Rep. 478; 56 Ill. 365; 6 Col. 1; 45 Mo. 212; 29 Conn. 528; 27 S. W. 571; 30 S. W. 430; 17 C. C. A. 66; 129 U. S. 440–1; Rorer, Railroads, 833, 1179; 1 Dillon, C. C. 568; 43 N. Y. 149; 35 Mass. 219. The power of the officials of the railroad company to employ and discharge servants, as occasion arises, is a trust reposed in them, laying on them a duty; and therefore such power cannot be delegated to or shared by others. 1 Mor. Corp. § 536; 2 Utah, 344; Law Rep. 1 Ch. 561–3; 2 Sand. 39; 12 R. I. 161; 56 N. H. 341; 4 B. Mon. 186; 40 Me. 186; Hill, Trustees, 279; 31 L. T. Rep. 52; S. C. 9 Ch. 691; L. R. 1 C. P. 674; 21 L. J. Ch. 837. The contract is void for want of mutuality, because it makes it the duty of appellant to retain appellee practically for life, while it provides no guaranty that appellee will not abandon the service whenever he sees fit. 42 Hun, 532; 2 M. & P. 86; 5 Bing. 34; 9 Ad. & E. 693; 3 D. & R. 676; 5 B. & Ad. 109; 1 Cr. & J. 340; 17 C. B. 725; 23 L. J. C. P. 177; Addison, Cont. § 10. The question of whether plaintiff had asked for the investigation provided for is one for the jury.

*Rose, Hemingway & Rose,* for appellee.

The contract does not so hamper the power of the railway company as to be against public policy. The question of want of mutuality in the contract was not raised below, and cannot now be discussed. The evidence of appellants shows that they

did not give the required investigation to the accident. The abstract of appellants does not set out the evidence and the contract fairly, and hence does not comply with the rules of this court.

BATTLE, J.   On or about the 18th day of May, 1894, W. J. Matthews instituted this action against the St. Louis, Iron Mountain & Southern Railway Company.   The complaint filed in the action is as follows:   "The plaintiff is by profession a locomotive engineer, and has been such for many years, and for over four years past he has been in the employment of the St. Louis, Iron Mountain & Southern Railway Company as such locomotive engineer, working under a contract, a copy of which is herewith filed and made part hereof.   By article 1 of said contract it is provided:   'No engineer shall be discharged or suspended without just and sufficient cause, and, in case an engineer believes his discharge or suspension to have been unjust, he shall make a written statement of the facts in the premises, and submit it to his master mechanic, and at the same time designate any other engineer who may be in the employ of the company at the time on the same division; and the master mechanic, together with the engineer last referred to, shall, in conjunction with the superintendent, investigate the case in question without unnecessary delay, and give prompt decision, and, in case the aforesaid discharge or suspension is decided to have been unjust, he shall be reinstated, and paid half time for all the time he has lost on such account.'

"By rules 13, 14, 16, and 17 of said contract it is provided that engineers shall be employed and discharged in the order of their seniority, the oldest engineer in service being entitled to be first employed, and the youngest engineer in the service being subject to be first discharged in case the company should reduce its force.

"The plaintiff was one of the oldest engineers in the service of the company, and, there being no possibility of the requirements of the service being diminished to such an extent as ever to necessitate his discharge under the contract, his employment was for life, or during good behavior.

"The plaintiff was earning under that contract from $135 to $185 per month, and would have continued to earn that sum

during the remainder of his natural life, but on the second day of January, 1894, in violation of said contract, and without cause, the plaintiff was by the defendant discharged from its service.

"Plaintiff has pursued the steps required by said article 1 for reinstatement, but the master mechanic of the defendant, acting under its orders, and without cause, refuses to reinstate him in the service.

"The plaintiff therefore prays judgment for the sum of $10,000."

Rules 13, 14, 16 and 17, referred to in the complaint, are as follows:

"(13)   When, from temporary slackness of business, an engineer in road service is thrown out of employment, he will be reduced from passenger to freight service, from freight to pusher service, and from pusher to switch-engine service, according to his seniority on the division. If it is necessary to lay off an engineer, the youngest engineer in switch engine service will be taken off.   This not to apply to switch engineers who are not eligible to road or pusher service by reason of not having fired on the road, or having waived their rights to same.

"(14)   During slackness of business, employment for surplus engineers will be found if possible on other parts of the system where needed, in preference to hiring new men, or promoting men already in service, with the understanding that whoever accepts such temporary transfer will be required to remain until business on his own territory justifies his recall by his own master mechanic.   No man to be promoted, or engineer hired, during absence of such transferred engineer, and while subject to recall to his own division, unless to meet an emergency or pressing demand of business; in which case such newly hired or promoted engineer shall hold no rights over the absent engineer.   Men so transferred will hold seniority rights on their own territory for a period of six months only, unless the master mechanic of the territory to which they are transferred finds it necessary for dispatch of business to retain them for a longer period.   Further, they have a preference, in accordance

with seniority, to any engine becoming vacant on their own territory over extra men still remaining on said territory. If, after accepting such transfer, they return to their own territory before they are recalled by their own master mechanic, they shall be considered new men on said territory.

"(16)  Promotions of engineers will be made according to seniority, from switch-engine service to pusher-engine service, if any on the division, and from pusher service to road service."

"(17)  When a passenger engine becomes vacant, the oldest freight engineer on the division where the vacancy occurs is entitled to the same.  When a freight engine becomes vacant, the oldest freight engineer in regular service on the division where the vacancy occurs is entitled to the same.  When any run becomes vacant, and the engineer entitled to said run refuses same, he loses his right to this run only, but will retain his rights, according to seniority, to next vacancy that may occur. When a passenger run extends over two or more freight divisions, each division is entitled to representation *pro rata* upon said run, each freight division selecting a representative in turn as may be agreed upon by the divisions interested.  In the absence of regular passenger engineer, when the extra passenger engineer is not available, the oldest freight engineer on the division shall be assigned to this service.  Any freight engine becoming vacant for a period of fifteen days or more shall be given to the oldest extra freight engineer.  No engineer shall be allowed to run on territory other than that to which he is assigned, except in case engineers assigned to such territory are not available.  This shall not apply to System's officers' specials."

These rules, among others, were signed only by "Frank Reardon, Superintendent of Locomotive and Car Department," and "Geo. C. Smith, Assistant General Manager."

The defendant, answering, admitted that the defendant was a locomotive engineer, and was in its employ as such on the second day of January, 1894, and that it had entered into an agreement with the engineers in its employment, which became effective on the first of January, 1892, and was in force on January 1, 1894, and that article 1 of the agreement is set out

in the complaint; but denied all the other allegations of the complaint, and averred that it discharged him from its service on the 2d of January, 1894, for gross negligence, and stated in what it consisted.

The issues in the case were tried by a jury. In the trial it was shown that the plaintiff was employed by the defendant as a locomotive engineer. It was admitted in the answer that the following article was a part of the contract:

"Art. 1. No engineer shall be discharged or suspended without just and sufficient cause, and in case an engineer believes his discharge or suspension to have been unjust, he shall make a written statement of the facts in the premises, and submit it to his master mechanic, and, at the same time, designate any other engineer who may be in the employ of the company at the time on the same division; and the master mechanic, together with the engineer last referred to, shall, in conjunction with the superintendent, investigate the case in question without unnecessary delay, and give a prompt decision; and, in case the aforesaid discharge or suspension is decided to have been unjust, he shall be reinstated, and paid half time for all the time lost on such account."

On the second of January, 1894, while he was in the employment of the defendant, he was in control of one of its locomotives pulling a freight train going north. When near Higginson Station, fifty miles north of Little Rock, the boiler exploded. The company discharged him, and he demanded an investigation, under article 1 of his agreement. He designated M. W. Cadle as the person who should make the investigation in conjunction with the master mechanic of the defendant. Cadle and the plaintiff appeared before the master mechanic, and demanded the investigation, which was granted. They made a joint examination of the boiler, and together discussed the cause of the explosion. The master mechanic reached the conclusion that the cause was the failure of the engineer to keep the boiler supplied with a sufficient quantity of water, and so reported to the proper officer. Cadle made no announcement of his conclusion—perhaps disagreed with the other arbitrator. No appeal to the superintendent was made, and no other investigation was demanded.

The names appended to the rules before referred to were those of Frank Reardon, the superintendent of the locomotive and car department of the Missouri Pacific Railroad Company, and of George C. Smith, the general manager of the same company. The rules were agreed upon by the Brotherhood of Locomotive Engineers and the company, and were accepted by them as modifications of the agreement entered into by them, of which article 1 of plaintiff's contract was a part. There is no direct evidence that these rules were made a part of the contract of plaintiff and defendant adduced, except that the plaintiff was a member of the Brotherhood of the Locomotive Engineers, and the admission of the defendant that article 1 was a part of their contract.

Evidence was adduced in the trial on the part of the plaintiff to show that he was discharged without sufficient cause, and on the part of the defendant that the explosion of the boiler was occasioned by the negligence of the plaintiff in permitting the water to get too low, and for that reason he was discharged.

The court, over the objection of the defendant, instructed the jury, at the request of the plaintiff, as follows:

"(1) If you find that the plaintiff was discharged from the service of the defendant because of the blowing down of the crown-sheet of the engine of which he was in charge, and that said crown-sheet was not blown down in consequence of his misconduct, then you will find for the plaintiff, and will assess his damages at the sum which he might reasonably be expected to have earned under his contract with the defendant down to the time of this trial, deducting such sums as he, by reasonable diligence, might have earned in similar business; but the burden of proof is on the defendant to show that the plaintiff might have obtained other similar employment."

At the request of the defendant the court instructed the jury as follows:

"The court charges the jury that if they find from the evidence that plaintiff was careless in the handling of his engine, and that such carelessness contributed to cause the said engine to blow down its crown-sheet, then the discharge of said

plaintiff by defendant railway company was not a violation of the contract sued on, and your verdict must be for defendant."

Except upon the credibility of witnesses, and the preponderance of evidence, and the burden of proof, no other instructions were given. The jury returned a verdict for $500 in favor of the plaintiff, and the court rendered judgment accordingly, and the defendant appealed.

Appellant contends that the contract sued on is void, because it is contrary to public policy. The reason given for this contention is that it takes from it the right to discharge its employees without the approval of a board of arbitration, and thereby deprives the railroad company of the power to discharge those duties imposed upon it by law which can be fully exercised only when it is allowed to discharge incompetent, careless, or inefficient servants, whenever, in its opinion, it may be necessary to do so. It is true that appellant undertook to reinstate any engineer who shall be discharged from its service, whenever, upon his complaint, its master mechanic and superintendent, and an engineer selected by him, shall, upon investigation, decide that the discharge was or is unjust. But if we assume that this stipulation is void because it is contrary to public policy, it may be eliminated without affecting the remainder of the contract. For it is separate and distinct from, and independent of, the other promises of the railroad company, which are legal, and the whole contract is founded upon one lawful consideration, the services of appellee. If, therefore, it be illegal, it is void, and the remainder of the contract is valid; the rule in such cases being that "where the consideration is tainted by no illegality, but some of the promises * * * * * are illegal, the illegality of those which are bad does not communicate itself to or contaminate those which are good, except where, in consequence of some peculiarity in the contract, its parts are inseparable, or dependent upon one another." *Western Union Tel. Co.* v. *Burlington & S. W. R. Co.* 3 McCrary, 130; *Ohio* v. *Board of Education,* 35 Ohio St. 519; *Erie Railroad Co.* v. *Union Locomotive & Express Co.,* 35 N. J. L. 245; *Corcoran* v. *Lehigh & Franklin Canal Co.,* 138 Ill. 390; *Peltz* v. *Eichele,* 62 Mo. 171; *Dean* v. *Emerson,* 102 Mass. 480; Clark on Contracts, p. 474.

But appellee is not seeking to enforce the article as to arbitration. He has abandoned that, and now asks for compensation for the damages occasioned by his discharge. Assuming that he can waive the arbitration, is he entitled to recover? That depends upon the terms of his contract. This brings us at once to enquire what the stipulations of the contract were. As said by Mr. Justice Strong in *Coffin* v. *Landis*, 46 Pa. St. 431: "It matters not what in our opinion would have been a reasonable arrangement, nor what it may be supposed the parties anticipated, nor whether the plaintiff's discharge was a hardship to him. The true question is, what was the contract? To what did the parties bind each other? We are not at liberty to make contracts for them, or to add any stipulations which they have not seen fit to incorporate. We cannot give to a'mere expectation the sanction or the binding force of a covenant."

Appellee, for a stipulated consideration, agreed to serve appellant in the capacity of an engineer. There was no contract as to the time he should continue to serve. Appellant agreed to pay him according to certain rates for his services, not to discharge him without just cause, to promote him according to certain grades of service, and, when it saw fit to reduce the number of its engineers, to discharge them in the order of their juniority in service, first discharging the youngest, and then the next, and so continuing until the number should be sufficiently reduced. There might have been in these promises an implied understanding on the part of appellant to retain appellee in its service so long as he should serve it acceptably as an engineer, unless he should be sooner discharged in the manner indicated. But we fail to discover any evidence of an agreement on the part of appellee to serve any specified time. Hence there was no contract that he would serve, and that the appellant would employ him, for any stated time,—the agreement of both being necessary to fix the time of service,—and, consequently, no violation of a contract by the discharge of appellee before the expiration of any particular time.

Quotations from the opinions of courts in a few cases will add force to and explain what we have said. In *Harper* v. *Hassard*, 113 Mass. 188, Chief Justice Gray, speaking for the court, said: "The written agreement in which the parties have

expressed the contract between them, and by the construction of which this case must be determined, consists of, 1st, a recital that the defendants intend to carry on the business of making oil and water colors, and wish to secure the services of the plaintiff in making said colors; 2d, an agreement of the plaintiff with the defendant that he will, during the term not exceeding three years from the date of this agreement, render and give his exclusive time, service, skill and energy to them in the manufacture of oil and water colors, and also instruct and teach during the said term the art of manufacturing or making colors in all its details, so far as it is in his power to do so; 3d, in consideration of the above, an agreement of the defendants during said term to pay this plaintiff thirty dollars per week as compensation for his services so rendered; 4th, an agreement of the plaintiff that he will not during the continuance of this agreement be connected with any other persons in the manufacture of colors. * * *

"There is no express agreement of the defendants to employ the plaintiff for three years, and no stipulation from which, in our judgment, such an agreement can be implied. The agreement appears to have been framed and adapted to secure to the defendants the right to the exclusive services of the plaintiff for such time, not extending beyond three years from its date, as he should perform such services and they should continue the business and require his services, paying him the stipulated compensation weekly, so long only as he should be employed by and faithfully serve them; but not to oblige them to continue the business, or to employ him therein, except at their own election, or to pay him any compensation after reasonable notice that they should no longer require his services."

In *East Line & Red River Railroad Co. v. Scott,* in 38 A. & E. R. Cases, 16, the agreement alleged was, "that the said company would thereafter employ plaintiff when this plaintiff should ask for and accept service and employment by the said company in the running and operating its said railroad in the employment of locomotive engineer,—that then being, and still is, the trade, occupation, and profession of your petitioner,—for whatever length of time of which your petitioner might desire to retain such employment, and at the reasonable and customary pay and

wages of such employee on railroads, which then was and still
is from one hundred to one hundred and fifty dollars per
month," etc. The court in speaking of this contract, said:
"We must take the contract as alleged in the petition to be the
contract on which appellee must recover, if at all, and, looking
to that, there can be no doubt that whether appellee should serve
appellant, and the term of such service, depended upon his own
will. It is very generally, if not uniformly, held, when the
term of service is left to the discretion of either party, or
the term left indefinite, or determinable by either party, that
either party may put an end to it at will, and so without
cause. *Harper* v. *Hassard*, 113 Mass. 187; *Coffin* v. *Landis*,
46 Pa. St. 431; Wood, Mast. & Serv. 133, 136, and
citations. When such a state of agreement exists, it is no
breach of contract to refuse to receive further services, and a
refusal to accept any at all, it would seem, at most would entitle
the engaged servant only to nominal damages. If the pleadings
of appellee be accepted as true, there can be no doubt that there
was an agreement that appellant would give employment to ap-
pellee, but as the period for which this should be done was
dependent on the will of appellee, to be exercised in the future,
there was no contract binding appellant to employ appellee for
any fixed period; the minds of the parties had not met as to a
material element of the contract to which the agreement looked,
—the period of service."

In *Bolles* v. *Sachs*, 37 Minn. 315, the parties executed an
agreement in writing, "whereby, for the expressed consideration
of the agreement of the plaintiff to conduct the business of the
defendants, selling such goods at Minneapolis as provided in
that instrument, the defendants agreed, for so long a time as
the plaintiff might elect, to employ the plaintiff in that busi-
ness; agreeing also that the plaintiff should have absolute and
sole control of the business, and that the defendants would not
employ any other agent or sell their goods to any other person.
The defendants further agreed by this instrument to pay to plain-
tiff $2,000 out of the first moneys collected from the accounts of the
firm of Bolles & Co.,   *   *   *   and, as compensation for such em-
ployment, to pay to the plaintiff one-half of all the profits to be
derived from the business to be conducted by the latter," who agreed

to conduct and manage it to the best of his ability.  No period was specified for the continuance of the service of the plaintiff. He was discharged.  He then brought an action, and recovered about $1,100 on account of an alleged breach of the contract. The court said: "The period of service or agency was left expressly and entirely to plaintiff's election; and in view of this it is most reasonable to construe the plaintiff's engagement to manage the business to the best of his ability, etc., not as qualifying his right of election, but as meaning that, during such time as he may elect to carry on the business, he will do so to the best of his ability.  There was not, then, any obligation on the part of the plaintiff to enter upon the employment; and, unless the agreement of the defendants to employ him is supported by some other consideration, it would not be obligatory upon them, but might be revoked before the other party had acted upon it.  *  *  *  But here we come to a difficulty which must avoid the verdict, involving, as it does, a receiving of some $1,100 for the breach of this agreement.  The damages so assessed consisted of the supposed loss of the profits of the business for a little more than a year intervening between the time of the plaintiff's discharge and the time of the trial.  The difficulty to which we refer is the want of certainty in the contract respecting the period of service.  The contract was perhaps effectual to give to the plaintiff the option to himself to fix the duration of it; but unless he exercised that election, and actually determined the period so as to make certain that which by the terms of the contract was uncertain, he could recover only for the period of his actual service.  He could not recover, as damages for the breach of the contract, the profits or remuneration which the business might have yielded during any period beyond the time when the contract was broken and the employment terminated."

For the reasons given, we conclude that there was no breach of the contract, in the case before us, by the discharge of the appellee before the expiration of any particular period of time, and that he was not entitled to recover any sum except compensation for actual service.  As the instruction given by the circuit court at the request of appellee is in conflict with this

conclusion, the judgment against appellant must be reversed, and it is so ordered, and the cause is remanded for a new trial.

BUNN, C. J., (dissenting)." The judgment in this case is reversed mainly, if not altogether, on the ground of a want of mutuality in the .contract or agreement sued on, in this, that while the said contract in effect binds the appellant company to give the appellee permanent or life employment with certain exceptions, it does not compel the appellee to continue in its service for any particular period, or to continue at all.

In support of this theory, the majority of the court cites and mainly relies upon the rule of the common law as stated in *East Line & R. R. R. Company* v. *Scott,* 38 Am. & Eng. R. Cases, page 17, and *Bolles* v. *Sachs,* 37 Minn. 315, the first a railroad case, and the other a traders' employment case, and some cases therein cited.

In *Railway* v. *Scott,* an enginer (whether while in the employ of the defendant company or not he received the injury is not stated) sued the company for personal injuries, laying his damages at a certain amount; and, before the termination of the suit, it was compromised by the defendant paying plaintiff the sum of $4,500, and, as the plaintiff claims, in addition to this, the defendant, as part of the consideration of the compromise, was to furnish plaintiff employment in his line for such time as he might desire; and when the plaintiff demanded to be employed under this agreement, defendant refused to employ him, and the plaintiff sued for such refusal, laying damages in the sum of $20,000. There was judgment for plaintiff in the sum of $2,400, and defendant appealed to the supreme court of Texas, where the same was reversed, mainly on the ground that the contract sued on was too indefinite, and wanting in mutuality, the plaintiff having the election and choice of fixing the period for his services to continue, and having failed to exercise that choice; thus leaving the courts without definite basis upon which to found a judgment, as in that case, for damages for refusal to employ as agreed, which case demanded the same definiteness and clearness of proof as if the prayer had been for specific performance of the contract; and a lengthy discussion is indulged as to the doctrine of mutuality in contracts in general.

The case of *Bolles* v. *Sachs* went off on pretty much the same course of reasoning as the case of *Railway* v. *Scott*, and was somewhat the stronger, because the nature of the employment was necessarily less permanent than the other, in the very nature of things.

The case at bar is quite different, and therefore the authorities cited by the majority of the court, in my opinion, are more or less inapplicable, principally because they are decisions in which it was not necessary for the courts rendering them to look away from the mere letter of the law, formulated in a different age, and in times when many conditions, as respect labor and employment, were unsuited to the changed condition of things and circumstances by which we are now surrounded. The case at bar is not for refusal to employ, but for discharging unjustly and without cause, which the contract forbade, and for refusing to keep the agreement to investigate the causes of discharge, and reinstate if found to be proper.

The plea of want of mutuality in the contract or agreement sued on is simply to the effect that a railway company cannot obligate itself to keep a competent engineer in its service for life or as long as its business continues, and it needs the services of such a one, because that one may have the option to quit its service when his business, convenience or pleasure may move him to do so.

I do not care to worry the profession with a lengthy argument on this subject, but in support of my dissent, I beg leave to refer to and adopt the decision in the case of *Carnig* v. *Carr*, 35 L. R. A. (Mass.) 512, and especially the very copious notes thereunder, wherein I think the position of the court is successfully overturned.

I cannot refrain from expressing the opinion that the decision in this case is more far-reaching than any that has been rendered by this court in a long time. I am of the opinion that the contract or agreement sued on is not only not objectionable for want of mutuality, but on the contrary is the result of the best thought of men, both professional and practical, whose lives have been devoted to the peculiar and wonderfully complicated and intricate business of operating modern railways. It is, in fact, a necessity to the employee, and an advantage

to the employer's business at the same time, that some such arrangement be had between them, and I think it should be embodied in their contracts rather than in attempts at legislation on the subject, for obvious reasons.