Nathaniel M. GRIFFIN et al *v.* John ERICKSON

82-211                                            642 S.W.2d 308

Supreme Court of Arkansas
Opinion delivered November 22, 1982

434

*R. Jack Magruder, III*, City Atty., by: *Robert T. Taylor* and *Carolyn B. Witherspoon*, Asst. City Attys., for appellants.

*Henry & Duckett,* by: *David P. Henry* and *James M. Duckett,* for appellee.

STEELE HAYS, Justice. The essential question here is whether John Erickson was wrongfully discharged in April 1980 from his job as Subdivision Administrator by Nathaniel M. Griffin, Director of the Office of Comprehensive Planning of the City of Little Rock. Relying on a document entitled "Statement of Management Policy", Erickson claimed he was discharged without cause and appealed to the City Manager, Carlton McMullen, who upheld the discharge. Erickson then filed suit against Griffin, McMullen and the City. The Chancellor held Erickson's discharge was not warranted under the proof and ordered his reinstatement with back pay totaling $30,502.68. On appeal, we reverse.

John Erickson was first employed by the City in 1963, working directly under Richard Wood, in what was then called the Department of Community Development. In 1977 a major change in emphasis and philosophy occurred in the office, shifting from a caretaking approach in subdivision development to a more professional approach, applying more updated principles of planning. Nathaniel Griffin was hired as director and the department was renamed "Office of Comprehensive Planning." In June of 1978, Erickson received a memorandum from Griffin outlining in depth his objectives for the office of Subdivision Administrator and pointing out areas of deficiency where improvement was expected. He proposed to review performance after six months and if merited, promotion would be recommended. In February of 1979, Erickson was promoted, but in May he received the first of a series of critical memoranda alleging excessive absences from the office. In September a memorandum went to all 15 members of the staff from Richard Wood dealing with poor work habits, tardiness, lax attitudes and inefficiency. A later memo from Griffin stressed the same points. On October 1, a memo to Erickson from Griffin and Wood referred to "Unacceptable Job Performance", generally stressing the same problems and mentioning tardiness and unwillingness to do unpleasant tasks or to work to capacity. In October and December Erickson

received memos from Griffin alleging the mishandling of six subdivision matters, outlining the alleged failures in specific terms. The following day a Wood to Erickson memo cited unacceptable job performance in connection with excessive or unauthorized absences from the office and in the preparation of the subdivision committee agenda. The memo suggested Erickson was becoming increasingly indifferent to the issues and solutions of the office and said another notice would result in termination or demotion.

In February 1980, a memo alleged that Erickson had left the office to go to the races without completing a report Griffin had requested in response to an inquiry from the City Manager's office. A March memo cited tardiness on March 27 and an unauthorized absence of 3.5 hours on March 28. In April 1980 Erickson was terminated for alleged substandard performance extending back to June 8, 1978.

Erickson requested a hearing pursuant to the "Statement of Management Policy" and a hearing was conducted first by the City Personnel Director, Ron Lloyd, and then by the City Manager, Carlton McMullen. Both affirmed the decision to terminate Erickson.

Before considering what effect the Statement of Management Policy may have had on the employment of John Erickson, basic elements of this case should be reexamined by reviewing the law with respect to the right of an employer to discharge an employee. It is generally, perhaps uniformly, held that when the term of employment is left to the discretion of either party, or left indefinite, or terminable by either party, either party may put an end to the relationship *at will* and *without cause*. See cases cited in 56 *Corpus Juris Secundum*, Master-Servant, § 31, p. 412 and 53 *American Jurisprudence* 2nd, Master-Servant, § 17, p. 94. It has been stated generally that employment is held only by mutual consent, and that at common law the right of the employer to terminate the employment is *unconditional* and *absolute*. *Jefferson Electric Company* v. *N.L.R.B.*, 102 F.2d 949 (1939).

Generally, a contract of employment for an indefinite term is a "contract at will" and may be terminated by either

party, whereas a contract for a definite term may not be terminated before the end of the term, except for cause or by mutual agreement, unless the right to do so is reserved in the contract. *Little* v. *Federal Container Corporation*, 452 S.W.2d 875 (Ct. of App. Tennessee, 1969).

Our own cases have adhered to this principle, that either party has an absolute right to terminate the relationship. *Miller* v. *Missouri Pacific Transportation Company*, 225 Ark. 475, 283 S.W.2d 158 (1955), *Moline Lumber Company* v. *Harrison*, 128 Ark. 260, 194 S.W. 25 (1917), *St. Louis, I.M. and S.R. Company* v. *Matthews*, 64 Ark. 398, 42 S.W. 902 (1897). Federal decisions applying Arkansas substantive law in this field are: *Tinnon* v. *Missouri Pacific Railroad Company*, 282 F.2d 773 (8th Cir. 1960); *Cato* v. *Collins*, 539 F.2d 656 (8th Cir. 1976), and *Clark* v. *Mann*, 562 F.2d 1104 (8th Cir. 1977). Nor does the fact that the employment is public rather than private alter the rule. *Ruggieri* v. *City of Somerville*, 405 N.E.2d 982 (Mass. 1980). *Board of Regents* v. *Roth*, 408 U.S. 564 (1972), and *Mittlestaedt* v. *Board of Trustees of the University of Arkansas*, 487 F. Supp. 960 (1980).

It is quite clear, therefore, that in the absence of some alteration of the basic employment relationship, an employee for an indefinite term is subject to dismissal at any time without cause.

Moreover, we have held firmly to this view even where a contract of employment provides the employee will not be discharged except for good cause. We have said that where an employer and an employee agree the employee shall not be discharged without cause, the contract is not enforceable where there is no agreement by the employee to serve for any specified time. In *St. Louis I.M. and S.R. Company* v. *Matthews*, 64 Ark. 398, 42 S.W. 902 (1897), we said:

It is very generally, if not uniformly, held, when the term of service is left to the discretion of either party, or the term left indefinite, or determinable by either party, that either party may put an end to it at will, and so *without cause.* (our italics).

Forty-six years later, in *Petty* v. *Missouri and Arkansas Railway Company*, 205 Ark. 990, 167 S.W.2d 895 (1943) we reaffirmed the rule in *Matthews*. Petty, a railroad engineer, claimed he was wrongfully discharged under a contract and asked that the *Matthews* case be overruled. We declined to overrule *Matthews* and said:

> We see nothing in [Matthews] that runs counter to any well established rule of law of contracts. On the contrary, it appears to us to be in harmony with the rule of mutuality of obligation. The fact that it was decided forty-five years ago and by a divided court, Chief Justice Bunn dissenting, is not sufficient to justify overruling it. Decisions of other courts are cited to support the decision made, and our investigation discloses that there are a number of decisions of courts of last resort since that time and up until quite recently that are in accord with it.

Whether *Petty* and *Matthews* should be followed now, we do not decide, as neither side has relied on these cases and we are unwilling to decide a question of significance in that setting. We cite these cases to illustrate how firmly ingrained in our case law is the rule that *either party* may terminate a contract of employment where no specific duration is agreed on even where the contract requires cause. A number of federal cases cite *Matthews* and *Petty* as the controlling substantive law of Arkansas. *Tinnon* v. *Missouri Pacific Railroad Co.*, 282 F.2d 773 (1960), *Smithey* v. *St. Louis Southwestern Railway Co.*, 237 F.2d 637 (1956) and *Roberts* v. *Thompson*, 107 F. Supp. 775 (E.D. Ark. 1952).

Erickson makes no claim that he was employed for a definite term. Rather, like *Petty* and *Matthews*, he claims the Statement of Management Policy prohibited his discharge without cause. The City, on the other hand, contends the SMP was not applicable to Erickson and, even so, sufficient grounds for his dismissal existed.

The City argues the SMP was never formally adopted and had no binding effect. Although the SMP was drafted with union members in mind, it was followed and applied as

the operating manual for non-union employees of the City and we find no reason to disregard it. The more difficult question is how literally it was intended to apply to professional employees. The instrument itself lacks clarity and we are unable to determine what is intended by it. We conclude that by usage it was generally applied to other employees as well as those expressly covered. At the same time we point out that literal compliance is not required. *Maxwell* v. *Southside School District*, 273 Ark. 59, 618 S.W.2d 148 (1981), and *McElroy* v. *Jasper School District*, 273 Ark. 143, 617 S.W.2d 356 (1981). The testimony of Carlton McMullen, and others, that with respect to professional employees the SMP was intended to be more of a *procedural guide* than a statement of strict substantive rights is plausible. Without belaboring the point, we are satisfied the SMP applied to John Erickson but we believe there was substantial compliance with its requirements and the hearings conducted by Lloyd and McMullen were sufficient.

Turning to the grounds themselves, the Chancellor found the discharge unwarranted by the proof, but we are convinced that view cannot be sustained. It would be impractical to attempt to examine the grounds separately. The list is too long and in some instances too complex. It was conceded some of the complaints were legitimate. We have studied the allegations and responses fully and putting the burden of proving justification on the City the evidence supports the termination. We find the Chancellor's findings to the contrary to be clearly erroneous. Besides, the grounds are merely symptoms of the problem, the important thing is the root causes and the inescapable fact is that John Erickson failed to perform professionally in a manner acceptable to his two immediate superiors. Plainly, he and Nathaniel Griffin had a fundamental difference of opinion in philosophy which was never resolved. Richard Wood's testimony attests to that and John Erickson's does not refute it, if anything it confirms it. Whatever the basic differences were, or which was correct, we cannot say. But it is clear the end result was a growing inability of the two men to work cooperatively toward the same end and in all probability it contributed to the decline in performance which both Griffin and Wood attributed to John Erickson. Wood

described the quality of Erickson's work as substandard, saying he became increasingly indifferent to the disciplines of the job, that he adopted a "so-what" attitude and told Wood he was not in accord with the objectives of the Planning Department, that his sympathies lay with the development community. Griffin's testimony was similar, in sum, that Erickson was not working up to capacity nor at a level acceptable to Griffin. These are the appraisals of the two men under whom John Erickson worked and whose concepts he was obliged to satisfy. Whether Erickson's philosophy was sound and Griffin's faulty is not for us to decide, but we believe a subordinate employee has a responsibility to accommodate his professional views and objectives to those of his superior if an efficient operation is to be achieved. The proof is that John Erickson declined to do that and chose instead to discuss his differences with Griffin with other members of the staff and with "forty to fifty" other people, yet not once did he go to Griffin to discuss areas of disagreement:

> Q. The point is you discussed your disagreement and problems that you had with Nat Griffin with somewhere between forty and fifty people, but yet you never bothered to discuss them with Nat Griffin.
>
> A. He never bothered to discuss them with me.
>
> Q. Well, I mean his office door was open, wasn't it?
>
> A. So was mine.
>
> Q. Well, how was he to know that you were having a problem philosophically?
>
> A. He was the one that — I was having no philosophical problems.

Erickson's assertion that Griffin never bothered to discuss problems with him is both inaccurate and revealing. The long memo to Erickson in June, 1978, explained Griffin's views and objectives for the planning department in detail. It invited questions from Erickson about the memo

and urged him to express his own views, not to be a "yes-man", proposing that once the staff had developed its position, it be unified in presenting that position.

Nor do we think unreasonable demands were put on Erickson. He makes no claim that that was so. He was expected to be prompt and regular in job attendance, yet it is plain that absenteeism was a problem and he had a tendency to be late, as one co-worker stated. We reject the notion that Erickson was the object of a vendetta.

There was testimony supportive of John Erickson which we have not overlooked: two secretaries testified that rules were loosely enforced and others were late and did not always follow the rules. One member of the Planning Commission testified that Erickson's presentations to the commission were clear and concise. A developer described his staff reports to the commission as forceful and articulate, regarding him as more knowledgeable and capable than Griffin. On the other hand, a former commission chairman said Erickson's presentations failed to frame the issues sufficiently for the commission to understand them, that Erickson did not know the material or knew it but failed to articulate it. He said the presentations were not clear and forthright and it was Richard Wood who got to the heart of the matter. Giving John Erickson the fullest benefit of these opinions, the test is not so much how outsiders saw his work, as how the men to whom he was responsible saw it, and of that there can be no question.

We have come to this view in part because we think the reinstatement of an employee at the professional level under the circumstances of this case would be especially unfortunate and ill-advised. If cooperative effort was lacking before, it would be nonexistent now. The authority of Woods and Griffin to manage and direct the staff would be undermined, and the orderly and efficient handling of the operation of the office would be impaired. Too, we have serious doubts that reinstatement is an available remedy. Our cases suggest otherwise. In *St. Louis I.M. and S.R. Company* v. *Matthews, supra,* the court questioned whether an employment contract calling for reinstatement was void

as against public policy, and other cases, without mentioning reinstatement, have said an employee wrongfully discharged has these remedies: he can either sue for damages for breach of contract or treat the contract as rescinded and sue to recover the value of his services on a quantum meruit basis. *Van Winkle* v. *Satterfield*, 58 Ark. 617, 25 S.W. 1113 (1894), and *Seaman Stores Co.* v. *Porter*, 180 Ark. 860, 23 S.W.2d 249 (1930).

The decree is reversed and the suit dismissed.