Robert C. GOETZ, Plaintiff,

v.

John L. HAYGOOD, et al., Defendants.

No. LR–C–82–903.

United States District Court,
E.D. Arkansas, W.D.

Feb. 22, 1985.

Timothy Davis Fox, W. Russell Meeks, III, Little Rock, Ark., for plaintiff.

P. Douglas Mays, Arkansas Game & Fish Com'n, Michael Moore, Friday, Eldredge & Clark, Little Rock, Ark., for defendants.

## MEMORANDUM OPINION

ROY, District Judge.

Plaintiff, Robert C. Goetz, is a citizen and resident of the State of Arkansas formerly employed by the Arkansas Game and Fish Commission. Defendants are the individual members of the Commission, the Director, Steve Wilson, and the former Chief of the Commission's Wildlife Management Division, John Haygood.

The Court has jurisdiction over the parties and the subject matter of the plaintiff's complaint under the provisions of 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3).

Prior to August 1, 1981, plaintiff had been employed as an assistant professor at Murray State University in Murray, Kentucky, where he had recently received tenure.

Plaintiff was employed by the Arkansas Game and Fish Commission on August 1, 1981 as Assistant Chief in the Wildlife Management Division.

On April 26, 1982, plaintiff was notified by letter that his position was to be eliminated and that his employment would terminate on June 15, 1982.

The Arkansas Game and Fish Commission is a public body created by Amendment 35 to the Constitution of the State of Arkansas. Its duties are the control, management, restoration, conservation and regulation of the birds, fish, game and wildlife resources of the State of Arkansas.

Plaintiff contends that his discharge deprived him of protected property and liberty interests in his continued employment with the Commission without due process of law.

Plaintiff did not receive a hearing prior to the April 26, 1982 memorandum notifying him that he was to be terminated. Plaintiff did, however, have the opportunity to appear before the Commission in executive session on May 17, 1982 and state why he felt he should not be terminated. Plaintiff was ultimately terminated as of June 15, 1982.

Upon being employed by the Commission, plaintiff took a one year leave of absence from his tenured position at Murray State. Plaintiff told defendant Wilson when he was employed that he wanted to get out of academics and into field work.

At the time he was employed, plaintiff signed an employment agreement. This agreement provided that plaintiff was a probationary employee for one year and could be terminated by written notice at any time during the twelve months probationary period. The employment agreement also stated that the plaintiff was to be provided with evaluations at prescribed intervals of three months and six months.

Shortly after assuming his duties, Goetz's problems developed in the working relationship between plaintiff and his immediate supervisor, John Haygood. Upon first becoming aware of the vacancy at the Commission, plaintiff applied for the position of Chief, but John Haygood was hired for that position. As Chief, Haygood was plaintiff's immediate supervisor, and a personality conflict caused their working relationship to rapidly deteriorate. Friction between the two necessitated intervention by Director Wilson, who attempted to smooth things out by having the lines of authority more clearly delineated. As a result of a meeting in January, 1982, between plaintiff, Haygood and Wilson, Haygood issued several memoranda attempting to better organize the division.

Also during plaintiff's employment, the Commission was informed that projected expenditures were expected to overtake projected revenues. On December 3, 1981, Ron Byrns, then Assistant Chief of the Fiscal Division prepared a memo to this effect directed to Director Wilson, Assistant Director Hunter and Deputy Director Broach. This memo inter alia projected that by the end of the 1982–3 fiscal year, the Commission would have inadequate funds to successfully perform its constitutional mandates.

After receiving no response to his December 3 memo, Byrns prepared a much more detailed projection on January 7, 1982. This projection made much the same forecast, but was prepared in more detail to show the nature and amount of projected expenditures.

Byrns presented this projection first at the January 4, 1982 staff meeting, attended by plaintiff. He then presented the report to the full Commission in open session at its January 18, 1982 meeting. The minutes of that meeting reflect that the report was fully discussed and indicated that conservation measures must be considered. A hiring freeze was unanimously approved.

Prior to the termination proceedings, plaintiff did not approach Haygood regarding the status of his position at Murray State or asking for a formal evaluation of his performance, although Haygood had counseled with plaintiff on numerous occasions as to what he considered deficiencies in plaintiff's performance.

During their February, 1982 conversation, plaintiff asked Wilson if he knew of any reason why he should return to Murray State. Wilson responded that there

were problems between plaintiff and Haygood but Wilson felt those problems could be solved. At the time of this conversation, Wilson did not think that the curtailment of expenses would cause a reduction in force, nor did he foresee that the relationship between plaintiff and Haygood would worsen. Wilson told plaintiff he hoped they would have a long relationship. Thereafter plaintiff resigned his position with Murray State. Plaintiff did not timely inform the defendants that he was required to advise Murray State by February 15, 1982 whether he would resume employment with Murray State or stay with the Commission at the end of the one year leave of absence. The defendants were unaware of the notification date until after plaintiff's tenure with Murray State had lapsed.

During the next two months, defendant Haygood attempted to evaluate his department for possible budget cuts. He determined that since his department had a high percentage of labor-related costs, that personnel reductions would be appropriate. He also determined to examine his work force to ascertain how to save the most money.

During this period, the working relationship between plaintiff and Haygood steadily worsened to the point that it was difficult to communicate. There were two assistant chiefs in the division, plaintiff and Mike Pledger, who was employed as an assistant chief after plaintiff was employed. Even though Pledger had been in the wildlife management division for a shorter period of time than plaintiff, he had been employed by the Commission in another division for a number of years. In connection with his prior duties, Pledger became well acquainted with both the personnel and the operation of the wildlife management division.

Haygood determined that his division could operate efficiently with only one assistant chief. He further determined that Pledger was the man for the job due to their better working relationship and due to Pledger's superior knowledge and longer experience with the Commission.

On April 14, 1982, Haygood handed the plaintiff documents titled 3 month and 8 month evaluations which indicated generally unsatisfactory performance by the plaintiff.

At the April, 1982 Commission meeting, the Commission went into executive session. Haygood was called into the executive session where he discussed his desire to make personnel reductions and his recommendation that plaintiff's position be eliminated. No formal action was taken by the Commission during this executive session.

On April 26, 1982, Haygood formally recommended to Wilson that plaintiff's position be eliminated. Wilson approved, and plaintiff was notified by memorandum that his position was eliminated and that his employment would cease on June 10, 1982. Wilson was the official with the authority to terminate employees.

Plaintiff then requested that he be allowed the opportunity to speak before the Commission concerning his termination. This request was granted, and plaintiff did appear before the full Commission in executive session on May 17, 1982. Prior to this executive session, plaintiff did not request to be provided with the reasons for his termination. In fact, his notification memo specified that he was being terminated for financial reasons. Neither did plaintiff request to be represented by counsel, to cross-examine any witnesses or that the meeting be in public.

Plaintiff appeared at the May executive session with copies of numerous documents which he distributed to the Commissioners. Then he was allowed to present the reasons why he felt Haygood's assessment of his performance was erroneous. This presentation lasted some two to three hours. Plaintiff did not attempt to persuade the Commission that its financial projections were erroneous.

Over the next several weeks, Wilson evaluated personnel requirements in other

divisions and attempted to find another position in which he could place the plaintiff. After discussing the requirements and possible vacancies with the various supervisory personnel, he determined that it would be in the best interests of the Commission not to reassign plaintiff to other duties and plaintiff was notified of his termination as of June 15, 1982.

Plaintiff filed the instant suit on December 13, 1982, alleging that he possessed a property interest in his employment with the Commission and that he was deprived of said property interest without due process of law when he was discharged. He also alleged that he had been deprived of his property interest in his professional and personal reputation (more properly labeled liberty interest) without due process of law.

Plaintiff has advanced several theories to support his allegation that he possessed a property interest in his employment with the Commission. His main contentions are: First, that he had an express contract giving rise to a property interest. Second, plaintiff alleges that he had an implied contract giving rise to a property interest. Third, that certain state statutes and personnel policies of the Commission gave rise to a property interest. And, fourth, that his tenured status with Murray State University somehow caused his employment with the Commission to rise to the level of a property interest.

A person seeking to establish a claim for relief under 42 U.S.C. § 1983 must establish two essential elements: (1) the deprivation of a right secured by the Constitution and the laws of the United States; and (2) that the person or persons who caused the alleged deprivation were "acting under color of state law."

The requirement of 42 U.S.C. § 1983 that challenged actions be under color of state law is treated as equivalent to the state action requirement of the Fourteenth Amendment's Equal Protection Clause. *Parks v. "Mr. Ford"*, 556 F.2d 132 (3rd Cir.1977); *Green v. Dumke*, 480 F.2d 624 (9th Cir.1973); *Smith v. Bekins Moving & Storage Co.*, 384 F.Supp. 1261 (E.D.Penn.

1974). Any actions taken by the defendants in this case were under color of state law. *Miller v. Hulsey*, 347 F.Supp. 192 (E.D.Ark.1972).

■ Due process considerations are not implicated in decisions to terminate employment unless termination adversely affects protected "property" or "liberty" interests. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

■ The Due Process Clause of the Fourteenth Amendment does not require that an employee be given a statement of the reason or reasons for the termination of his employment or a pretermination hearing unless the employee establishes a "protected property" interest in his employment. In the present case, the plaintiff has the burden of establishing that his employment with the Commission was a "protected property" interest within the meaning of the Fourteenth Amendment to the United States Constitution. *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972):

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Id.* at 577, 92 S.Ct. at 2709.

■ Property interests are not created by the Constitution. They are created and defined by existing rules and understandings "that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*, at 577, 92 S.Ct. at 2709; *see also Bishop v. Wood, supra*. One method of determining whether the plaintiff had a "protected property" interest in continued employment is by referring to applicable state law.

■ Plaintiff's contract *expressly* stated that either the employee or the Commission could terminate employment by written notice at any time during the twelve months

probationary period.[1] Under Arkansas law, an employee with such a contract is employed at-will, and can be terminated at any time. *Petty v. Missouri & Arkansas Railway Co.,* 205 Ark. 990, 167 S.W.2d 895 (1943).

In *Johnson v. City Council of Green Forest,* 545 F.Supp. 43 (W.D.Ark.1982), the court stated, "Since it seems to be agreed that plaintiff's employment was terminable at will, he did not have a property interest entitling him to notice and hearing prior to his discharge." *Id.* at 50. *Bishop v. Wood, supra; Board of Regents v. Roth, supra; Kyles v. Eastern Nebraska Human Services,* 632 F.2d 57 (8th Cir.1980); *Williams v. Day,* 553 F.2d 1160 (8th Cir. 1977); and *Brouillette v. Board of Directors of Merged Area IX,* 519 F.2d 126 (8th Cir.1975).

An Arkansas case, *Wilson v. Robinson,* 668 F.2d 380 (8th Cir.1981) held that employees who had *served beyond their probationary period* had a property interest in their continued employment. In the case at bar, the plaintiff had not served beyond his probationary period.

The situation in the case at bar is very similar to that in *Jones v. Georgia,* 725 F.2d 622 (11th Cir.1984), where the court stated:

Jones had no property interest in continued employment under Reg. 12.301.1. *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). While Jones's supervisors apparently referred to the wrong regulation, such a mistake does not create a federal interest where none existed before … *Roth* clearly precluded Jones's claim of deprivation of a property interest.

Jones also was deprived of no liberty interest. No impairment of a liberty interest occurs "when there is no public disclosure of the reasons for the discharge." *Bishop,* 426 U.S. at 348, 96

S.Ct. at 2079. Supreme Court precedent foreclosed this claim of Jones.

■ Plaintiff contends that a material part of his contract was a requirement of periodic evaluations of his performance and that such evaluations were not timely prepared. This contention does nothing, however, to support his claim of a property interest based upon an express contract. Arkansas law holds that an employee for an indefinite term is an at-will employee, even if his contract requires just cause for his discharge. *Petty, supra; Griffin v. Erickson,* 277 Ark. 433, 642 S.W.2d 308 (1982). The issue of performance evaluations cannot change the duration of plaintiff's employment contract, and thus has no effect on his status as an at-will employee. Accordingly plaintiff's express contract theory must fail.

■ Plaintiff makes several arguments for relief under the theory of an implied contract and applicable personnel policies. Under the implied contract theory plaintiff must prove an alteration or modification of his express contract which would constitute a property interest in continued employment.

As the Court stated in *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), a property interest may arise from an implied contract. It was also recognized in *Perry,* however, that "If it is the law of Texas that a teacher in the respondent's position has no contractual or other claim to job tenure, the respondent's (property interest) claim would be defeated." (Parenthetical material supplied). *Id.* at 602, n. 7, 92 S.Ct. at 2700, n. 7. The law in Arkansas is that any employment contract, whether express or implied, which does not state a specific term of duration, is terminable at the will of either party. Thus, under Arkansas law and under *Perry, supra,* since plaintiff's contract was for an indefinite duration, any vague state-

---

1. Plaintiff's contract stated:

"The employee's signature below indicated that he/she has read and fully understands the terms of this Agreement under which either the employee or the Commission may terminate employment by written notice at anytime during the twelve (12) month probationary period."

ments made by Wilson could not change the at-will nature of his contract.

Plaintiff again argues (as he did under the express contract theory) that his supervisor's failure to timely submit performance evaluations somehow altered his basic status as an at-will employee. The defect in this argument is that, being an at-will employee, plaintiff was subject to termination even if his performance was exemplary.

■ Plaintiff also contends that he was misled by defendant Wilson into relinquishing his status at Murray State University. This contention is based upon a conversation plaintiff had with Wilson shortly before his February 15, 1982 resignation from Murray State. He basically argues that if his termination was based upon financial reasons, Wilson knew of the possibility that such termination could or would occur, and that Wilson wilfully withheld such knowledge for the purpose of inducing plaintiff to give up his tenure at Murray State. The proof does not support this contention. Wilson testified that he did not anticipate personnel reductions to be a part of the Commission's budget cutting measures. Wilson's actions were not intended to modify and did not modify the terms of plaintiff's employment contract. From the evidence in the record, the court finds Wilson attempted to smooth things out for plaintiff and not to deceive him.

Plaintiff next contends that the Commission's personnel policies were sufficient to give rise to a property interest in continued employment with the Commission. The law on this theory is that if the Commission had established policies which afford procedural steps to be taken prior to dismissal but toward that end, then (it) is bound to comply with these established standards. *Gerrin v. Hickey,* 464 F.Supp. 276, 280 (E.D.Ark.1979).

Plaintiff contended that he was not in fact terminated due to financial reasons. Yet plaintiff has never alleged that he was terminated for some constitutionally impermissible reason. Therefore, the reasons for plaintiff's discharge under his property interest theory are totally irrelevant.

■ Plaintiff cannot challenge in this forum the appropriateness of the decision to terminate him. As the Supreme Court has stated:

"The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. (Footnote omitted). We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. *The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights we must presume that official action was regular and, if erroneous, can best be corrected in other ways.* The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions. [emphasis added].

*Bishop v. Wood, supra* 426 U.S. at 349–350, 96 S.Ct. at 2080.

The principles enunciated in *Bishop v. Wood* are appropriate here and speak loudly in the case at bar.

Director Wilson testified that there were more than 400 employees working for the Commission and it would certainly be ill-advised for this court to oversee the hiring and firing of these employees absent violations of constitutional rights.

■ It is also plaintiff's contention that the Commission's dismissal policies were not complied with in his termination. The answer to this argument is that no procedural steps were established by the Commission for the discharge of probationary employees such as plaintiff. This argument actually is that his employment status under his contract was modified which we do not find to be correct. However, even if such limitations appeared in the

dismissal procedures, which they do not, they have no effect upon plaintiff's status as an at-will employee, subject to termination at any time for any reason. In discussing *Petty, supra,* and *St. Louis I.M. & S.R. Co. v. Matthews,* 64 Ark. 398, 42 S.W. 902 (1897), the Arkansas Supreme Court stated:

> "We cite these cases to illustrate how firmly engrained in our case law is the rule that *either party* may terminate a contract of employment where no specific duration is agreed on *even where the contract requires cause.* [emphasis supplied].

*Griffin, supra,* 277 Ark. at 438, 642 S.W.2d at 311. Thus, even if the Commission's dismissal policies were found to constitute a part of plaintiff's contract, they would not change his status as an at-will employee. The policies provided no procedural steps to be followed prior to discharge of a probationary at-will employee such as plaintiff, and they do not constitute the *"de facto* policies" as contemplated in *Gilbreath v. East Arkansas Planning and Development District, Inc.,* 471 F.Supp. 912 (E.D.Ark.1979), and *Gerrin, supra.*

■ Furthermore, the Court does not find any merit in plaintiff's contention that he has acquired a property interest in his employment with the Commission by virtue of the Freedom of Information Act [Ark. Stat.Ann. § 12–2801 et seq. (Ref.1979) ] or other Arkansas statutes or failure of the Commission to keep records.

All public offices should make every effort to comply with all state statutes, and failure to do so may give rise to certain remedies, but in this case the Court does not find the alleged omissions of the Commission changed the at-will employment contract of the plaintiff.

Plaintiff's last theory to support his claim of a property interest is based upon his relinquishment of his tenured position at Murray State University. What he really seems to be claiming, however, is a cause of action for intentional interference with contractual relations.

■ It appears from the record that defendants did not deprive plaintiff of his tenured position at Murray State. He resigned that position. Second, the inducement for plaintiff to accept employment with the Commission had nothing to do with either job security or representations that he would be periodically evaluated. He accepted employment because the money was right and because he wanted to leave academic work.

Defendant Haygood testified that the events which formed the basis for his evaluations were discussed with plaintiff at the time they occurred. Thus, plaintiff knew all along how his immediate supervisor evaluated his performance. Yet he never asked Haygood to complete the formal evaluations. Nor did he approach Haygood at all before he went to Wilson in early February, 1982 to inquire as to his status. By plaintiff's own admission he did not ask Wilson about the evaluations. It is not apparent why plaintiff did not inquire about the evaluations.

Plaintiff could only prevail under a contractual interference theory, and to do so he would have to show intentional interference with his rights at Murray State. *Bishop v. Tice,* 622 F.2d 349 (8th Cir.1980). He implies that information was purposefully withheld until after he had resigned his former position, and then used to terminate him, all evidently for the purpose of firing him and leaving him without another job to which he could return. Plaintiff was unable to present any evidence of intentional conduct on the part of defendants sufficient to support his allegations.

Furthermore, the Court finds this theory to be completely illogical and contrary to the direct testimony of defendants Haygood and Wilson which the Court finds to be credible.

■ As to plaintiff's next claim that he has been deprived of a liberty interest we will review the record. In order to establish a liberty interest, plaintiff must prove that defendants publically disseminated false and stigmatizing information about him in connection with his discharge

and that such dissemination adversely affected his ability to find work. *Board of Regents v. Roth, supra.* Plaintiff has not proved that defendants publically disseminated any information about his discharge, nor that any allegedly disseminated information was false nor that any allegedly disseminated information had a causal connection with his supposed difficulty in finding other employment.

The court, in *Swope v. Bratton,* 541 F.Supp. 99, 109 (W.D.Ark.1982) held that deprivation of a liberty interest occurs where discipline or discharge imposes a stigma upon future employment.

In *Windsor v. The Tennessean,* 719 F.2d 155 (6th Cir.1983), *cert. denied,* —— U.S. ——, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984), the court held:

> Windsor initially contends that he was entitled to procedural due process under the fifth amendment before being terminated. The district court found, however, that since plaintiff possessed no legitimate property or liberty entitlement, due process was not necessary. *See Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). We agree with the district court.
>
> Windsor possesses no property entitlement because the Attorney General's power to remove assistant United States attorneys is unconditional . . .
>
> Nor does plaintiff possess a liberty interest. Such an interest could arise if false reasons for the discharge were publicly disseminated, thus stigmatizing Windsor and foreclosing other employment opportunities. *See e.g., Roth,* 408 U.S. at 572–573, 92 S.Ct. at 2706–2707. Windsor does not allege, however, that the reasons for the discharge were publicly disclosed. Consequently, even if the reasons were untrue or fabricated, Windsor has not pleaded a protectible liberty interest in his professional reputation. *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Since Windsor has no protectible property or liberty interest in continued employment, this

court need not discuss what process would be due were plaintiff to possess such an interest.

*Id.* at 159.

In *Nathanson v. United States,* 630 F.2d 1260 (8th Cir.1980) the court stated:

> This Court has held that allegations similar to those involved here are not the type of stigmatizing charges which would preclude a person from obtaining future employment. *Elkin v. Roudebush,* 564 F.2d 810, 813 (8th Cir.1977) (charge of unsatisfactory performance as a nurse and with difficulties with interpersonal relationships). Other courts have agreed. *Ventetuolo v. Burke,* 596 F.2d 476, 483 (1st Cir.1979) (charges of insubordination, hostility toward the director and complete refusal to accept the commands of the director [footnote omitted]; *Stretten v. Wadsworth Veterans Hosp.,* 537 F.2d 361, 366 (9th Cir.1976) (charge of incompetence and inability to get along with co-workers). [footnote omitted].
>
> *Id.* at 1264–1265.

Thus, plaintiff has failed to prove a violation of a liberty interest in connection with his discharge.

The Court has carefully considered all evidence presented by plaintiff at the trial including that which the Court initially had some reservation about receiving[2] but its content in no way modifies the outcome of this case. The Court also finds the excluded hearsay testimony of Glen Wilkes and Larry Pharris to be irrelevant to the determinative issues.

Accordingly, since plaintiff has failed to meet the burden of proving either a property interest or a liberty interest in continued employment with the Commission, his claim must be dismissed with prejudice.

Each party shall bear its own costs.

---

**2.** This includes the testimony concerning the Executive sessions.